DAVID S. GORBATY, Judge.
 

 hThe City of New Orleans and Eric Hessler (collectively referred to herein as “defendants”) appeal a judgment rendered against them for the wrongful death of Steven Hawkins, Jr. For the following reasons, we reverse.
 

 FACTS:
 

 On March 17, 2000, Sergeant Eric Hes-sler (hereinafter “Sgt. Hessler”), an off-duty police officer employed by the New Orleans Police Department (hereinafter “NOPD”), shot Steven Hawkins, Jr. Mr. Hawkins died the next day. The facts surrounding the events leading up to the shooting are greatly disputed.
 

 Sgt. Hessler testified at trial that on March 16 he was to meet Sgt. Catalanotto and Officer Daniel Scanlan at 9 p.m. at the Beach Corner Lounge on Canal Boulevard. When the others arrived, they drove to the French Quarter and parked near the 8th District station at about 11 p.m. Sgt. Hes-sler stated that he did not eat anything or drink anything alcoholic while at the Beach Corner. He was dressed in plain clothes that evening and was carrying his weapon under his shirt. The trio was supposed to meet Officer Keaton and his girlfriend to look for a | ..suspect known to frequent the French Quarter. Officer Keaton did not show; however, Sgt. Hessler, Officer Scan-lan. and Sgt. Catalanotto decided to walk around the upper end of the Quarter for about 1/& hours to look for the suspect. Sgt. Hessler remembered going to the House of Blues and Razoo’s, but not going in. The officers also looked into several other bars looking for the suspect. At approximately 12:30 a.m., Sgt. Hessler returned to the Beach Corner Lounge with his fellow officers and consumed one beer. He remained at the Beach Corner for less than an hour, and then drove his personal vehicle, a Jeep, to the Saturn Bar on St. Claude Avenue. When he entered the Saturn Bar he was told that it was closing, so he got back in his vehicle, drove lake bound on Clouet Street, turned right on Marais Street and right again on Louisa Street. As he was traveling on Louisa Street towards the intersection with St. Claude Avenue, he heard what sounded like a gunshot coming from his right. He saw an individual running eastbound on St. Claude shooting toward the tire shop on the east side of Louisa. Sgt. Hessler drove through the individual’s path, turned right onto St. Claude and stopped his vehicle in the middle of the street facing Elysian Fields Avenue. He exited his vehicle on the driver’s side, armed with his handgun. He saw a man, later identified as Steven Hawkins, Jr., come into view behind his vehicle running in the direction of the tire shop. Mr. Hawkins was still holding a handgun in his outstretched hand. As Mr. Hawkins approached the intersection, he fired his gun again down the sidewalk in front of the tire shop. Sgt. Hes-
 
 *1218
 
 sler moved away from his vehicle in a southerly direction to get a better view of Hawkins. Sgt. Hessler |stestified that he yelled “Police! Drop the gun!” As he did, Mr. Hawkins turned to his right and fired in Sgt. Hessler’s direction. Sgt. Hessler fired five shots, striking Mr. Hawkins with one shot, causing him to fall to the ground. Sgt. Hessler again ordered Mr. Hawkins to drop his weapon. When Mr. Hawkins did not comply, Sgt. Hessler approached him and kicked the weapon away. Sgt. Hessler testified that he then noticed another man approaching telling him that he had shot the wrong man. Sgt. Hessler retrieved his radio from his vehicle, called NOPD to report the incident, and requested an emergency vehicle. He then secured the scene and awaited back-up.
 

 According to Samuel Green, an employee of Samuel’s Tire Shop and the only known eyewitness to the incident, Mr. Hawkins had brought his girlfriend’s vehicle to get a tire fixed. While he and Mr. Hawkins were on the ground between Hawkins’ vehicle and the tire shop discussing the tire, two masked robbers, one armed with a handgun, approached them and demanded their belongings and Mr. Hawkins’ car keys. They then ordered Mr. Hawkins to “run up the block,” and for Mr. Green to get in the tire shop office. Mr. Hawkins complied and began running on St. Claude Avenue towards Elysian Fields Avenue. However, Mr. Hawkins returned and fired one shot at the two men who were attempting to start his girlfriend’s vehicle. Mr. Green testified that this was the shot Sgt. Hessler heard. Contrary to the version of events given by Sgt. Hessler, Mr. Green testified that Sgt. Hessler did not identify himself, but instead jumped out of his vehicle and began firing at Mr. Hawkins. At no time did Mr. Hawkins aim his weapon at Sgt. 14Hessler. Mr. Green claims to have yelled at Sgt. Hessler that he was shooting the wrong man, to which Sgt. Hessler replied he could not be shooting the wrong man because Mr. Hawkins was firing a weapon.
 

 PROCEDURAL HISTORY:
 

 Godiva Hawkins Robertson, Steven Hawkins, Sr., and Joell Jackson, on behalf of the minor child, Kevin Jackson, and the Succession of Steven Hawkins, Jr., filed suit on March 19, 2000, naming as defendants Sgt. Hessler and the NOPD. The petition alleged that Godiva Hawkins Robertson and Steven Hawkins, Sr., were the mother and father of the decedent, Steven Hawkins, Jr. Further, Joell Jackson was alleged to be the mother of the decedent’s only child, Kevin Jackson. Godiva Hawkins Robertson and Steven Hawkins, Sr., claimed to be entitled to damages pursuant to La. Civ.Code art. 2315, and Joell Jackson, on behalf of the minor child, was entitled to damages pursuant to Art. 2315.2. Joell Jackson, as the succession representative, was entitled to damages in the survival action pursuant to Art. 2315.1.
 

 On March 21, 2000, plaintiffs filed their first supplemental and amending petition. The petition was amended to add the specific damages suffered by Joell Jackson, on behalf of the minor, and to delete the paragraphs naming Godiva Hawkins Robertson and Steven Hawkins, Sr., as the surviving parents of the deceased.
 

 A second supplemental and amending petition was filed on July 19, 2000, to add unnamed insurance companies as defendants, and to supplement the list of 1 snegligent acts by defendants. The petition further added Sgt. Hessler’s homeowners and/or personal liability insurers as defendants.
 

 On November 2, 2000, Godiva Hawkins Robertson, Steven Hawkins, Sr., and Joell Jackson, on behalf of the minor, filed a petition to establish filiation and paternity, explaining therein that Kevin Jackson was
 
 *1219
 
 believed to be the son of the decedent, but that testing was needed to confirm that belief. According to the petition, defendants were aware of the petition and had no opposition to the testing. The court ordered Reliagene Technologies, Inc., to perform the testing on the minor, Godiva Hawkins Robertson and Steven Hawkins, Sr.
 

 In March of 2001, plaintiffs filed a motion to dismiss the petition for filiation and paternity, suggesting that they no longer desired to proceed with the action. On the same day, plaintiffs filed a third supplemental and amending petition. The petition was amended to add acts of negligence by Sgt. Hessler, and to substitute Godiva Hawkins Robertson and Steven Hawkins, Sr., as parties entitled to damages pursuant to La. Civ.Code arts. 2315.1 (survival action) and 2315.2 (wrongful death action). The third petition also dismissed Joell Jackson, on behalf of the minor and as succession representative, from the suit.
 

 In July of 2003, the trial court issued a judgment granting an exception of no cause of action filed on behalf of the NOPD. The judgment recognized that the NOPD is a governmental entity not capable of being sued. The judgment further ordered that the claims against the City of New Orleans (hereinafter “the City”) | fiwould be tried by the judge, and the claims against Sgt. Hessler would be tried by a jury.
 

 On August 26, 2003, plaintiffs filed their fourth supplemental and amending petition adding as a defendant Richard Pennington, the NOPD superintendent at the time of the incident. The petition also amended the original petition to state the sole and proximate cause of the incident was the negligent and/or intentional acts or omissions of Sgt. Hessler, which were attributable to the City and Superintendent Pennington. Additionally, the petition was amended to enumerate the negligent acts of the City and Superintendent Pennington.
 

 On November 24, 2003, the City answered all four of plaintiffs’ petitions denying most of the allegations and asserting numerous defenses.
 

 During 2003, several judgments were issued by the trial court, including the aforementioned judgment granting the City’s exception of no cause of action, ordering a judge trial as to the City and a jury trial as to Sgt. Hessler, and other discovery related matters. The City sought a supervisory writ from this Court, which was denied on the showing made. The Supreme Court, however, granted the City’s writ and remanded the matter to this Court for further consideration. This Court ordered that the entire record and transcripts of relevant hearings, as well as a
 
 per curiam
 
 be submitted for purposes of review. On April 19, 2004, this Court rendered an opinion on the issue of whether the case against Sgt. Hessler should be tried to a judge or a jury. Because we found that plaintiffs had admitted Sgt. Hessler was in the course and scope of his employment with the NOPD, the |7trial court erred in ordering that the claims against him be tried to a jury. The Supreme Court denied plaintiffs’ writ.
 

 In September 2004, defendants filed peremptory exceptions of no cause or right of action alleging that the remaining plaintiffs, Godiva Hawkins Robertson and Steven Hawkins, Sr., were not proper parties to the action. The argument was based on the fact that initially allegations were made that the decedent had a son, who would be the proper party to pursue causes of action for wrongful death and survival. Defendants argued that because the remaining plaintiffs are inferior beneficiaries according to statute, they must ne
 
 *1220
 
 gate the existence of superior beneficiaries to recover. Plaintiffs opposed the motion explaining that although Joell Jackson was married to another man at the time she conceived and gave birth to the minor, Kevin Jackson, and denied having sexual relations with the deceased during that time period, she requested plaintiffs’ counsel to include her and her son in the petition. It is unclear if blood tests were ever performed as ordered by the court, but nonetheless, the petition was amended to delete Joell Jackson and her son as plaintiffs. Plaintiffs Godiva Hawkins Robertson and Steven Hawkins, Sr., argued that because Joell Jackson admitted that Kevin Jackson was not the decedent’s son they are the rightful statutory beneficiaries to pursue the survival and wrongful death actions. Defendants countered that merely dismissing Joell Jackson and her son from the lawsuit does not affirmatively prove that Kevin Jackson was not the decedent’s son or that the decedent had other children. |sPlaintiffs responded with the affidavit of Steven Hawkins, Sr., attesting to the fact that his son was never married, and never fathered or adopted any children.
 

 In May of 2005, defendants filed a motion for court ordered DNA testing of the minor, Kevin Jackson. Defendants averred that they were entitled to contest the plaintiffs (parents) right of action.
 

 On the date of the hearing for the above motion, plaintiffs attempted to file a fifth supplemental and amending petition to add a paragraph verifying that the decedent was never married, did not have any children, was never adopted, and never adopted anyone. However, the trial court denied them leave to file because the deadline for doing so had passed.
 

 The trial court signed a judgment on July 29, 2005, denying the defendants’ motion to order DNA testing. Defendants filed a motion requesting written reasons for the ruling, and filed a notice of intent to seek supervisory writs from this Court, which this Court denied.
 

 After remand from the Supreme Court, this Court considered briefs and argument of counsel on September 19, 2006. This Court decided that the trial court, in its vast discretion in granting physical examinations pursuant to La.Code Civ. Proc. art. 1464, did not err. The Supreme Court denied the City’s writ.
 

 In April 2007, the City filed a motion for summary judgment seeking to establish that Sgt. Hessler had acted reasonably under the circumstances. The trial court denied the summary judgment reasoning that issues of material fact existed. 19The City noticed its intent to seek a supervisory writ from this Court, but none was filed.
 

 This matter came for trial in March and April of 2008. The trial court rendered judgment on July 10, 2008, finding in favor of plaintiffs for a total of $700,000.00, together with costs and legal interest. The trial court also issued lengthy reasons for its decision.
 

 STANDARD OF REVIEW:
 

 Our review of the trial court’s findings in the present case is subject to the manifest error rule. It is well settled that an appellate court may not set aside a trial court’s finding of fact in the absence of manifest error or unless it is clearly wrong, and where two permissible views of the evidence exist, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong.
 
 Cole v. Department of Public Safety & Corrections,
 
 01-2123 (La.9/4/02), 825 So.2d 1134;
 
 Stobart v. State through Dept. of Transp. and Dev.,
 
 617 So.2d 880 (La.1993). Even though an appellate court may feel its own evaluations and inferences are more reasonable than the fact finder’s, reasonable evalúa-
 
 *1221
 
 tions of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony.
 
 Rosell v. ESCO,
 
 549 So.2d 840 (La. 1989). When the findings are based on determinations regarding the credibility of witnesses, the manifest error-elearly wrong standard demands great deference to the findings of fact, for only the fact finder is cognizant of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said. |inM Where documents or objective evidence so contradict a witness’s story, or the story itself is so internally implausible on its face, that a reasonable fact finder would not credit the witness’s story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination.
 
 Id.
 
 at 845.
 

 Application of the manifest error standard of review does not mandate an af-firmance of a lower court decision with respect to findings of fact. Where an appellate court finds manifest error, the factual findings of the trier of fact may be reversed.
 
 Alexander v. Pellerin Marble & Granite,
 
 93-1698 (La.1/14/94), 630 So.2d 706, 710. Specifically, when an error of law taints a record, the appellate court is not bound to affirm the judgment of the lower court.
 
 Rosell,
 
 549 So.2d at 844. Furthermore, when a trial court makes one or more prejudicial legal errors which interdict the fact-finding process, the manifest error standard is no longer applicable, and the appellate court is obliged to make its own independent,
 
 de novo
 
 review of the record if such is complete.
 
 Evans v. Lungrin,
 
 97-0541, 97-0577, p. 7 (La.2/6/98), 708 So.2d 731, 735;
 
 McLean v. Hunter,
 
 495 So.2d 1298, 1303-04 (La.1986). As stated by the Supreme Court in
 
 Evans:
 
 Legal errors are prejudicial when they materially affect the outcome and deprive a party of substantial rights.”
 
 Evans,
 
 708 So.2d at 735.
 

 ASSIGNMENTS OF ERROR NOS. 1, 2 and 3:
 

 Defendants argue that the district court erred and abused its discretion in denying their Peremptory Exceptions of No Cause of Action or Right of Action. 11T Defendants also argue that the district court and this Court erred in denying a discovery request for DNA testing to prove the decedent’s paternity, or lack thereof, and having denied the aforementioned request, erred in refusing to disqualify plaintiffs’ counsel from this case.
 

 As stated earlier, the plaintiffs’ filed in this record a petition to establish filiation and paternity. Defendants were thus on notice of the filing. In March 2001, plaintiffs filed a motion to dismiss the petition to establish filiation and paternity, and on the same day, amended the petition in the main demand to delete Joell Jackson on behalf of the minor from the lawsuit. Defendants did not challenge Godiva Hawkins Robertson and Steven Hawkins, Sr.’s right to pursue the cause of action on behalf of their deceased son until September of 2004.
 

 In
 
 Hernandez v. State, through DOTD,
 
 02-0162, 02-0163 (La.App. 4 Cir. 10/16/02), 841 So.2d 808,
 
 order on rehearing
 
 12/30/02, this Court considered whether the defendant DOTD could collaterally attack a declaratory judgment nullifying a notarial act of adoption. Ms. Hernandez filed suit against DOTD for the wrongful death of her natural mother, Barbara Hendley, who was killed in an automobile accident. Several years prior to the accident in question, Ms. Hernandez, a major, and her aunt who had reared her from childhood, executed a notarial act of adoption whereby Ms. Hernandez was adopted by her aunt. Follow
 
 *1222
 
 ing Ms. Hernandez’s deposition on the first day of trial, DOTD filed a peremptory exception of no right of action, citing Ms. Hernandez’s testimony that she had been adopted by her aunt. DOTD relied on a consistent line of cases holding that 11 ¡¡children given in adoption are not included in the classes of persons entitled to bring wrongful death actions.
 

 Ms. Hernandez subsequently filed in a totally separate action a Petition to Revoke, Rescind, and Declare Statutory Adoption Invalid, asserting that she was not advised of her legal rights at the time she signed the notarial act. The trial judge signed an
 
 ex parte
 
 judgment declaring the adoption “invalid, null, void and without effect as though it had never been executed.” Armed with this judgment, Ms. Hernandez opposed DOTD’s exception of no right of action. The trial judge denied the exception and DOTD sought supervisory writs from this Court.
 

 Ms. Hernandez argued that the declaratory judgment was a final judgment not subject to collateral attack by DOTD. However, this Court noted that the declaratory judgment was sought and rendered after the filing of DOTD’s exception. Thus, the DOTD’s challenge to the declaratory judgment could not be considered a collateral attack, since the judgment did not exist at the time of the filing of the exception. Ms. Hernandez also argued that because DOTD failed to timely appeal the declaratory judgment or otherwise seek review of the judgment in the separate proceeding that resulted in the issuance of the judgment, this Court lacked jurisdiction to entertain a challenge. Ms. Hernandez did admit that DOTD was not a party to the petition resulting in the declaratory judgment, and that DOTD was not made aware of the filing of the petition, or the issuance of the declaratory judgment until the applicable appeal delays had run.
 

 This Court stated that there are three ways to challenge a final judgment: |1S1) a timely application for new trial; 2) a petition for nullity; and, 3) a timely appeal. The Court noted that DOTD was precluded, however, from filing any of the above due to its lack of knowledge of the
 
 ex parte
 
 declaratory judgment.
 

 In the instant case, defendants were fully aware of the petition to establish filiation and paternity because the petition was filed into the record of the main demand. When the order was signed dismissing Joell Jackson from the lawsuit and the third supplemental and amending petition was filed deleting Joell Jackson as a plaintiff in March 2001, defendants had the opportunity to challenge the standing of Godiva Hawkins Robertson and Steven Hawkins, Jr., and to request either the results of the previously ordered DNA testing, if such results existed, or to request that the minor child and the parent plaintiffs be tested. Instead, defendants waited until September 2004 to file the exception of no right of action. Defendants now argue that the trial court erred in denying their exception of no right of action.
 
 [1]
 

 As the exceptors, defendants had the burden of proof on the exception. Rather than immediately attack the dismissal of Joell Jackson from the lawsuit and challenge the parent plaintiffs’ right to proceed, defendants waited over three years. The purported ruling denying defendants’ exception had long since become final. Not until May 2005, over four years after the purported judgment became final, defendants sought to demand the DNA test
 
 *1223
 
 ing of the minor child, a non-party. As previously discussed, the trial court denied defendants’ request, writs 114were taken to this Court, and denied. After remand from the Supreme Court ordering briefing and argument, this Court again denied the writ.
 

 In
 
 Day v. Campbell-Grosjean Roofing & Sheet Metal Corp.,
 
 260 La. 325, 256 So.2d 105, 107 (1972), the Supreme Court stated:
 

 With regard to an appellate court, the “law of the case” refers to a policy by which the court will not, on a subsequent appeal, reconsider prior rulings in the same case. This policy applies only against those who were parties to the case when the former appellate decision was rendered and who thus had their day in court. Among reasons assigned for the application of the policy are: the avoidance of indefinite relitigation of the same issue; the desirability of consistency of the result in the same litigation; and the efficiency, and the essential fairness to both parties, of affording a single opportunity for the argument and decision of the matter at issue.
 

 Nevertheless, the law of the case principle is applied merely as a discretionary guide: Argument is barred where there is merely doubt as to the correctness of the former ruling, but not in cases of palpable former error or so mechanically as to accomplish manifest injustice. Further, the law of the case principle is not applied so as to prevent a higher court from examining the correctness of the ruling of the previous court.
 

 This Court reiterated the above principles in
 
 Zatarain v. WDSU-Television, Inc.,
 
 95-2600, p. 10 (La.App. 4 Cir. 4/24/96), 673 So.2d 1181, 1186, stating:
 

 This court generally applies the “law of the case” doctrine when reviewing an issue decided on supervisory writs as part of the appeal of the case following a trial on the merits, except when it finds either that the previous decision is based on palpable error or that manifest injustice would result.
 

 Accordingly, we find that defendants did not timely appeal the denial of their exception of no right of action. It was their burden to prove the exception had merit, but they did not attempt to carry that burden until they sought DNA testing | isfour years later. The trial court did not err in denying the exception of no right of action because at the time it did so, defendants had not carried their burden of proof. Defendants did not attempt to prove their position until almost a year after their exception was denied. Thus, the ruling by this Court was not based on palpable error, and is the law of the case.
 

 Concerning defendants’ argument that the district court and this Court erred in denying their motion to disqualify plaintiffs’ counsel, we find no merit in their argument. Defendants allege that they intended to call plaintiffs’ counsel as a material witness because he attested to the veracity of the allegations contained in the original petition. Plaintiffs’ counsel attested to the allegations and facts contained in the petition to the best of his knowledge. When it came to his attention that plaintiff Joell Jackson was not a proper party as tutrix of the minor child originally thought to be the decedent’s child, he amended the petition. We find no merit to this assignment.
 

 ASSIGNMENT OF ERROR NO. 4:
 

 Defendants assign as error the trial court’s denial of a motion for summary judgment in which they argued that no material facts were in dispute. Specifieal
 
 *1224
 
 ly, they pointed to plaintiffs’ memorandum in opposition to the motion arguing that the memorandum, despite its length, did not reference any material fact that remained in dispute and did not cite to any authority as to why defendants’ motion should not be granted. In reasons for judgment, the trial court stated that there existed issues of material fact as to whether the force used by Sgt. Hessler was reasonable under the circumstances. We find no error in this decision.
 

 1 ^ASSIGNMENT OF ERROR NO. 5:
 

 Defendants aver that the district court erred in denying their motion
 
 in limine
 
 to exclude the testimony of Jim Bowman and in qualifying Mr. Bowman as an expert at trial. Defendants argue that Mr. Bowman, to whom the trial court refers in reasons for judgment as an expert in accident and shooting reconstruction and investigation
 
 [2]
 
 , did not qualify as an expert under the
 
 Dcmbert/Foret
 
 rule governing admissibility of expert testimony.
 

 Generally, under the standards set forth in
 
 Daubert v. Merrell Dow Pharmaceuticals, Inc.,
 
 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and adopted by our Supreme Court in
 
 State v. Foret,
 
 628 So.2d 1116, 1121 (La.1993), the trial court is required to perform a “gatekeep-ing” function to “ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.
 
 Daubert,
 
 509 U.S. at 589, 113 S.Ct. at 2795. In performing this function, a trial court must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.
 
 Kumho Tire Company, Ltd. v. Carmichael,
 
 526 U.S. 137, 152, 119 S.Ct. 1167, 1176, 143 L.Ed.2d 238 (1999). While
 
 Daubert
 
 specifically addressed scientific evidence,
 
 Kumho
 
 made clear that the trial court’s essential gatekeeping function applies to all expert testimony, including opinion evidence based solely on special training or experience.
 
 Id.,
 
 526 U.S. at 148-149, 119 S.Ct. at 1174-1175. Ultimately, “the trial judge must determine whether the testimony has ‘a reliable basis in the knowledge and experience of [the relevant] discipline’ ”
 
 Id.,
 
 526 U.S. at 149, 119 S.Ct. at 1174 (quoting
 
 Daubert,
 
 509 U.S. at 592, 113 S.Ct. at 2796). “Whether
 
 Daubert’s
 
 specific factors are, or are not, | ^reasonable measures of reliability ... is a matter that ... the trial judge [has] broad latitude to determine,” and a decision to admit or exclude is reviewed on an abuse-of-discretion standard.
 
 Id.,
 
 526 U.S. at 153, 119 S.Ct. at 1176.
 

 Pursuant to
 
 Daubert, supra,
 
 and
 
 State v. Quatrevingt,
 
 93-1644 (La.2/28/96), 670 So.2d 197,
 
 cert. denied,
 
 519 U.S. 927, 117 S.Ct. 294, 136 L.Ed.2d 213 (1996), relevant factors determining whether scientific evidence is reliable include:
 

 (1) The “testability” of the scientific theory or technique;
 

 (2) Whether the theory or technique has been subjected to peer review and publication;
 

 (3) The known or potential rate of error; and
 

 (4) Whether the methodology is generally accepted in the scientific community.
 

 State v. Edwards,
 
 97-1797 (La.7/2/99), 750 So.2d 893,
 
 cert. denied,
 
 528 U.S. 1026, 120 S.Ct. 542, 145 L.Ed.2d 421 (1999).
 

 Jim Bowman’s curriculum vitae disclosed that he has been employed as an accident reconstructionist since 1991. Pri- or to that time, he was employed as a police captain in charge of the motorcycle traffic division and school patrol for the
 
 *1225
 
 Pascagoula, Mississippi, police force. He was responsible for training officers in traffic collision investigations, traffic collision prevention and traffic enforcement. From May 1968 to February 1970 he was a patrolman in Imperial Beach, California.
 

 Mr. Bowman’s education consists of a bachelor of science in criminal justice from the University of Southern Mississippi. He was trained extensively in the area of vehicular traffic accident reconstruction, including accidents involving bicycles and trains. The only evidence of training involving reconstruction of shooting incidents was a course taught at the Institute of Police Technology and Management. Mr. Bowman was questioned about this course in his videotaped | ^deposition. He explained that the course was a 24-hour course which he had taken four to five years prior to the date of his deposition, October 11, 2007. Mr. Bowman testified that he had been accepted twice as an expert in shooting reconstruction; however, he had no recollection of the case names, the year he testified, or in what court the cases were heard. Prior to this case, Mr. Bowman had never been qualified as an expert in any field in the State of Louisiana.
 

 We find that the trial court erred in accepting Jim Bowman as an expert in crime scene reconstruction and investigation. Mr. Bowman’s training and experience, although extensive, did not include training in crime scene investigation. Mr. Bowman conducted his investigation during the week following this incident in March 2000. He admitted during cross-examination on the tender that he attended a 24-hour course which included discussion of shooting incidents, four or five years prior to his deposition. Thus, that training would have occurred two or three years after the incident he investigated. At oral argument, plaintiffs’ counsel contended that Mr. Bowman had training in blood spatter analysis, however, such training has no bearing on this case. Plaintiffs’ counsel knew of no articles published by Mr. Bowman at all, much less articles subjected to peer review.
 

 Further, because we find it was error to admit the testimony of Mr. Bowman, we find that the trial court erred in admitting the drawings depicting the crime scene introduced during Mr. Bowman’s testimony and used extensively throughout the trial because Mr. Bowman did not create the drawings. Rather, he submitted his measurements and conclusions to an architect who then rendered the drawings. The architect was not listed on plaintiffs’ witness list and was not subject to [^examination by the defendants. Accordingly, we strike from the record all testimony of Jim Bowman and all exhibits attributable to his investigation.
 

 ASSIGNMENT OF ERROR NO. 6:
 

 Defendants argue that the trial court misinterpreted the facts in an attempt to force a result. Further, because the trial court misapplied the law, this Court should make a
 
 de novo
 
 review of the record. After a thorough review of the record, we agree that the trial court made unreasonable interpretations of the facts and then misapplied the law pertaining to the use of deadly force. We will thus conduct a
 
 de novo
 
 review.
 

 The issue before the court below and this Court on review is whether Sgt. Hes-sler acted reasonably in approaching an armed and dangerous suspect, which ultimately led to the suspect’s death. The law applicable to the use of deadly/excessive/unreasonable force by a police officer has been discussed and applied to different facts numerous times by our Supreme Court.
 

 
 *1226
 
 The premier case in this regard is
 
 Kyle v. City of New Orleans,
 
 358 So.2d 969 (La.1977), which involved an incident whereby police officers forcibly entered an apartment to arrest the occupants who the police believed had committed a crime, but later determined had not. The occupants of the apartment sued the police force alleging, among other things, injuries sustained by a shotgun blast. The Court discussed the use of reasonable force and enunciated a test to be used when evaluating these types of encounters:
 

 The use of force by law enforcement officers must be tested by the “reasonable force” standard established by this article [La.Code Crim. Proc. Art. 220]. The test precludes “clearly inappropriate force.”
 

 The use of force when necessary to make an arrest is a legitimate police function. But if the officers use | ¡^unreasonable or excessive force, they and their employer are liable for any injuries which result.
 

 Whether the force used is reasonable depends upon the totality of the facts and circumstances in each case. A court must evaluate the officer’s actions against those of ordinary, prudent, reasonable men placed in the same position as the officers and with the same knowledge as the officers.
 

 Several factors to be considered in making this determination are the known character of the arrestee, the risks and dangers faced by the officers, the nature of the offense involved, the chance of the arrestee’s escape if the particular means are not employed, the existence of alternative methods of arrest, the physical size, strength, and weaponry of the officers compared to the arrestee, and the exigencies of the moment.
 

 Kyle,
 
 353 So.2d at 972-973 (citations omitted).
 

 Applying these factors, the Supreme Court found that the police officers used excessive force in making the arrest. The police testified they acted as they did because they believed the suspects were armed. However, the Court found that there was no evidence of immediate danger; the officers saw no weapons prior to blasting through the door with shotguns. The officers knew there were no means of escape for the occupants, and the officers were heavily armed.
 
 Id.
 
 at 974.
 

 The Court did recognize “that police officers serve and protect the public at great risks to themselves. A felony arrest is often an emergency confrontation, requiring instantaneous, on-the-spot decisions. Hence, in these situations, police officers are not expected to act with the same clarity of judgment as others in the calm atmosphere of home or office.”
 
 Id.
 

 Several years later, the Supreme Court was again faced with a case involving the alleged use of excessive force. Gerard Mathieu brought suit against the City of New Orleans and several police officers after he was shot on the property of a nursing home. The police had been notified that a suspicious looking person with l^a gun had been seen peering into windows at the nursing home. When officers arrived, they were told by employees of the nursing home that the suspect was sleeping nearby in the grass on the nursing home’s property. The officers approached quietly with the intention of disarming the man as he lay sleeping. Also, because this was a high crime area frequented by drug users, the officers were concerned that the suspect might be intoxicated or on drugs. As one of the officers approached, the suspect raised his head, and pointed his gun at one of the officers. The officer shot at the suspect, emptying
 
 *1227
 
 his gun. He dropped, rolled to the side, and began to reload his weapon. The other officer, seeing his partner drop and seeing the suspect now pointing the gun at him, fired, striking the suspect twice. One of the officers testified that the entire episode lasted for only a “split second.” After shooting the suspect, the officers approached only to discover that the gun was a toy. They later learned that the suspect was a paranoid schizophrenic who was off of his medications.
 
 Mathieu v. Imperial Toy Corp.,
 
 94-0952 (La.11/30/94), 646 So.2d 318.
 

 The Supreme Court in reversing the lower courts’ findings of negligence by the police officers applied a duty/risk analysis. It first examined whether the officers owed a duty to Mr. Mathieu, and if so, what kind. The Court acknowledged that no legal standard had yet been established for officers to follow when approaching a subject prior to disarming him, although a legal standard had been established for officers to follow when making an arrest.
 
 Id.
 
 at 323,
 
 citing Kyle, supra.
 
 The Court found that there was no reason why the standard of “reasonableness under the totality of the circumstances” enunciated in
 
 Kyle
 
 when approaching a suspect should be different.
 

 In the instant case, the trial court made the following findings of fact:
 

 Iggln light of the testimony and evidence submitted, the Court finds the following: that the decedent, Mr. Hawkins, Jr., was running down Saint Claude Avenue and fired a shot across Louisa Street; that defendant, Sgt. Hes-sler, was traveling on Louisa Street; that Sgt. Hessler entered the “kill zone” (the direction of the muzzle of the gun barrel), passed through and exited the “kill zone” while turning right onto Saint Claude Avenue. The Court further finds that when Sgt. Hessler exited the Jeep and stepped away from the vehicle, he unintentionally discharged his weapon, which would account for the spent bullet in the ground near the driver’s side door and the alleged third shot he said he heard. The Court is further of the opinion that Mr. Hawkins, Jr. turned his head only upon hearing that first shot from Sgt. Hessler’s gun. Thus allowing for the position of the bullet entering Mr. Hawkins, Jr.’s head. (Dr. Sperry testified that the bullet entered the right side of Mr. Hawkins Jr.’s head 3.5 inches above the center of his ear and exited at the back and to the left.)
 

 Further, the Court finds that Mr. Hawkins, Jr. was left-handed and that the testimony and evidence does not support Sgt. Hessler’s contention that Mr. Hawkins, Jr. fired his gun at Sgt. Hessler with his right hand. There is no evidence that supports the contention that Mr. Hawkins, Jr. fired his weapon at Sgt. Hessler (the alleged third bullet and third casing were never found).
 

 In light of the totality of the facts of this case, i.e. the length of time that the defendant waited for his fellow officers, and the number of places they visited in the French Quarter, along with the NOPD’s failure to have Sgt. Hessler tested for alcohol after the incident, this Court finds the testimony of Sgt. Hes-sler, that he had only one drink that night to be reasonably and logically incredible.
 

 The trial court found that Sgt. Hessler owed a duty to Mr. Hawkins to act reasonably under the circumstances. We agree. The trial court, however, foundJ^Sgt. Hes-sler did not act reasonably and thus breached the duty because he was not responding to a call, and did not have the benefit of being informed of a situation already assessed prior to his arrival on the scene. The trial court makes the quantum
 
 *1228
 
 leap to find that 1) because Sgt. Hessler had been drinking, he 2) decided to exact deadly force upon Mr. Hawkins.
 

 We find troubling the trial court’s finding that Sgt. Hessler had been drinking to an extent that his judgment was impaired. Sgt. Hessler testified that he may have had a soft drink while he waited for his fellow officers at the Beach Corner Lounge. He testified that he did not drink anything while in the French Quarter, but did drink one beer at the Beach Corner Lounge after he and his fellow officers returned from the French Quarter. He also testified that he told the investigating officer on the scene that he had consumed one beer. We have searched the record in this case, and have found no evidence that Sgt. Hessler drank more than one beer that evening. Therefore, the trial court had to infer that Sgt. Hessler had been drinking prior to this incident. We find that to be an unreasonable inference.
 

 We are cognizant that where two reasonable views of the evidence exist, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong.
 
 Stobart v. State,
 
 617 So.2d 880, 882-88 (La.1993). Sgt. Hessler and one of the officers who accompanied him to the French Quarter both testified that their purpose that evening was to attempt to locate a murder suspect. The officers walked around the French Quarter looking into bars and lounges with a picture of l^the suspect and knowledge that the- suspect may have a bandaged arm.
 
 [3]
 
 There was no testimony to indicate this was a social outing, nor was there testimony to contradict the officers’ testimony that it is not unusual for off-duty policeman to look for suspects. Thus, the factual finding that Sgt. Hessler was somehow impaired either physically or mentally is not supported by conflicting evidence between which the trial court had to decide. When the evidence relied upon is solely circumstantial, that evidence taken as a whole, must exclude every other reasonable hypothesis with a fair amount of certainty.
 
 Lacey v. Louisiana Coca-Cola Bottling Co.,
 
 452 So.2d 162, 164 (La.1984). The circumstantial evidence upon which the trial court relies goes against the clear weight of the direct evidence. Therefore, the district court’s finding that Sgt. Hes-sler consumed more than the one beer to which he admitted, and that drinking impaired his judgment is not a reasonable view of the evidence and is manifestly erroneous.
 

 The trial court also found that Sgt. Hessler’s actions were not reasonable because he was not responding to a call, and did not have the benefit of prior assessment before his arrival on the scene. Sgt. Hessler did not have to be apprised of the situation by a radio dispatch, nor did he have to assess Mr. Hawkin’s character prior to intervening. Sgt. Hessler came upon a man running down a major thoroughfare shooting a gun. Mr. Hawkins’ actions constituted criminal behavior; it was Sgt. Hessler’s duty to intervene.
 

 Major Kerry Najolia, a 24-year veteran of the Jefferson Parish Sheriffs Office and the director of training at Jefferson Parish’s police academy, testified |2Rfor the defense. He explained the concept of force continuum, a checklist that an officer should mentally employ when encountering a dangerous situation. He explained that an officer’s appearance on the scene can sometimes be sufficient to end the situation. If not, the officer should pro
 
 *1229
 
 ceed to giving verbal commands. Next, an officer would use physical weaponry, that is, restraining persons involved. If still not sufficient, intermediate weaponry would be employed, for example, batons, TASERs, pepper spray. Lastly, if an officer perceives that he or bystanders are in danger of lethal or deadly force by the perpetrators, he should proceed to use deadly force. If an officer happens upon a situation involving a man shooting a gun in a neighborhood, he should proceed immediately to deadly force. Thus, Mr. Hawkins did not have to point his gun or shoot at Sgt. Hessler; Sgt. Hessler’s response was appropriate.
 

 Additionally, the trial court found that Sgt. Hessler did not act reasonably because Mr. Hawkins was not a suspect, but was rather “a civilian who was shooting in an attempt to thwart a carjacking.”
 

 Carjacking is defined at La.Crim.Code art. 14:64.2 A:
 

 Carjacking is the intentional taking of a motor vehicle, as defined in R.S. 32:1(40), belonging to another person, in the presence of that person, or in the presence of a passenger, or any other person in lawful possession of the motor vehicle, by the use of force of intimidation.
 

 Louisiana Revised Statutes 14:20 at the time of this incident, defined justifiable homicide relative to a carjacking as:
 

 (3) ... when committed against a person whom one reasonably believes is attempting to use any unlawful force against a person present in a motor vehicle ..., while committing or attempting to commit a ... robbery of such ... motor vehicle.
 

 (4) When committed by a person lawfully inside a ... motor vehicle ..., against a person who is attempting 12,¡to make an unlawful entry into the
 

 ... motor vehicle, or who has made an unlawful entry into the ... motor vehicle, and the person committing the homicide reasonably believes that the use of deadly force is necessary to prevent the entry or to compel the intruder to leave the ... motor vehicle.
 

 Floyd Green, a tire shop employee, who admitted to smoking crack cocaine the day of this incident, and was brought in to testify from Hunt Correctional Center where he was serving time for his fourth felony drug conviction, testified that Mr. Hawkins was ordered by the robbers to run down the street away from the tire shop. Hawkins returned firing a gun as the robbers attempted to start the vehicle. When they saw Mr. Hawkins firing at them, they exited the vehicle and ran east on St. Claude Avenue. At the time Mr. Hawkins was firing his gun, there were no passengers in Mr. Hawkins’ vehicle nor was he in the vehicle with the robbers. Thus, although one could argue that the robbers were “carjacking” Mr. Hawkins’ vehicle, he was not justified in shooting a gun at them. Another interesting fact is that Mr. Hawkins had a gun on his person when he ran down the street. The record reveals that Mr. Hawkins’ girlfriend was the owner of the gun, and that she kept it in the glove compartment of her vehicle for protection. This fact begs the question: How did Mr. Hawkins get the gun out of the glove compartment after he was ordered by the robbers to empty his pockets and run down the street?
 

 After making the initial findings of fact, which we have determined to be largely erroneous, the trial court proceeded to apply the factors listed in
 
 Kyle
 
 and
 
 Mathieu
 
 to the facts as it determined them to be.
 

 1„A.
 
 Known character of the arrestee:
 

 The trial court characterized Mr. Hawkins as a law-abiding citizen with no crimi
 
 *1230
 
 nal record. As stated above, Mr. Hawkins was not justified in firing his weapon.
 

 In
 
 Stroik v. Ponseti,
 
 96-2897 (La.9/9/97), 699 So.2d 1072, 1078, fn. 5, the Court noted that if the defendant officer had known the plaintiff was a hostage and not a suspect, the duty owed by him would be different. However, because he believed plaintiff was a suspect along with the actual perpetrator, his duty was to approach in a reasonable manner under the circumstances. Mr. Hawkins was firing a gun down St. Claude Avenue; Sgt. Hessler’s actions were reasonable under the circumstances.
 

 B. Risks and dangers faced by the officer:
 

 Applying the
 
 Kyle/Mathieu
 
 factors, the trial court again stated in its reasons that Mr. Hawkins was a law-abiding citizen with no criminal record. As discussed
 
 infra,
 
 Mr. Hawkins’ actions were not justified by the law. It is therefore of no moment whether or not he had a criminal record. He was breaking the law at the time Sgt. Hessler came upon the scene, thus giving Sgt. Hessler probable cause to act. Indeed, plaintiffs’ expert, Dr. Schindler, testified that when Sgt. Hessler arrived on the scene, he had probable cause to believe either 1) an attempted second degree murder; 2) attempted manslaughter; 3) attempted negligent homicide; or, 4) illegal discharge of a weapon had just taken place. It is not the law that police officers can only intervene in a situation if they have been told to do so by a dispatcher. Contrary to the trial court’s assessment, Sgt. Hessler would have been derelict in his duties if he had not intervened in the situation unfolding before him.
 

 haThe trial court also discusses the fact that Sgt. Hessler initially was not in the “kill zone,” as he drove down Louisa Street; however, he chose to drive through the “kill zone” and park his car on St. Claude Avenue. Presumably, the trial court reasoned that Sgt. Hessler created the dangerous situation that prompted him to use deadly force against Mr. Hawkins. That reasoning is a gross misinterpretation of the facts and the procedure police officers are bound to follow.
 

 First, Sgt. Hessler was driving a vehicle a short distance from where he first saw Mr. Hawkins. If he was driving at the speed limit of 20 m.p.h., it would be seconds before he crossed Mr. Hawkins’ path. Without proceeding onto St. Claude Avenue, Sgt. Hessler would have no way of “assessing the situation,” something the trial court found he did not do. Dr. Schindler, plaintiffs’ expert, suggested that Sgt. Hessler should have driven across the median on St. Claude Avenue, then turned left, clearly placing himself without any cover or concealment when he alighted from his vehicle, and losing precious seconds to stop Mr. Hawkins from firing his gun.
 

 C. Nature of the offense involved:
 

 The trial court found that Sgt. Hessler erred in assessing the area as being populated. This finding was based on the fact that Sgt. Hessler did not see anyone on the street in the direction in which Mr. Hawkins was firing. The court then disagrees with plaintiffs’ expert’s opinion that Sgt. Hessler had probable cause to believe Mr. Hawkins was committing any one of four felonies. The court’s reasoning was that the felonies listed all required a victim or some other person to be present. Because Sgt. Hessler, whom the trial court found not credible, said he did not observe anyone else on the scene, commission of the felonies was not possible.
 

 LflThe Court takes judicial notice of the fact that the area of the city where this incident took place was heavily populated
 
 *1231
 
 in 2000. We also note that people have been injured or killed while in their homes by stray bullets penetrating a wall or door. Thus, to reason that the area was not populated because Sgt. Hessler did not see anyone other than Mr. Hawkins on the street is absurd.
 

 In
 
 Stroik,
 
 699 So.2d at 1078, the Supreme Court held: “[i]n this case, the officers were responding to reports of multiple armed robberies committed by mobile perpetrators. In addition, the suspects had already severely injured a pedestrian while attempting to flee. As in
 
 Mathieu,
 
 because the complained of behavior involved a weapon, the nature of the offense must be characterized, and the officers had every reason to treat it, as serious and potentially life-threatening, (emphasis added).
 

 Mr. Hawkins was shooting a gun in a populated area. It was reasonable for Sgt. Hessler to believe Mr. Hawkins was shooting at someone.
 

 D. Likelihood of escape:
 

 The trial court reasoned that this factor was not applicable because Mr. Hawkins was not an arrestee. In fact, it was unlikely that Mr. Hawkins would have been charged with any crime, because he was actually the victim of a robbery and carjacking. However, because Sgt. Hessler did not take the time to properly assess the situation, he did not know that Mr. Hawkins was a victim before he shot him.
 

 This is another mischaracterization of the facts by the trial court. Mr. Hawkins was committing a crime by discharging his weapon. He was attempting to exert deadly force upon someone, even if not Sgt. Hessler. As explained herein, Mr. Hawkins was not justified in shooting at someone to protect his property. | snNeither he or a passenger was in any danger when the alleged robbers were attempting to steal his vehicle.
 

 Thus, because Sgt. Hessler had probable cause to believe Mr. Hawkins was committing a crime, he acted properly in preventing Mr. Hawkins’ escape.
 

 E. Alternative methods available:
 

 The trial court relied on the testimony of Dr. Schindler to find that Sgt. Hessler could have taken a few more seconds to evaluate the situation, e.g., find out why Mr. Hawkins was shooting a gun and where he was shooting.
 

 In
 
 Stroik,
 
 the Supreme Court reasoned that “[i]n
 
 Mathieu,
 
 we recognized the existence of other available alternative methods does not, in and of itself, render the method chosen unreasonable.
 
 Mathieu,
 
 94-0952, p. 9, 646 So.2d at 324. Consequently, the scope of the officers’ duty to act reasonably under the circumstances does not operate to restrict the officers to employing only the best of several available alternatives, or the least intrusive. Instead, Officer Ponseti was charged with choosing a reasonable course under the circumstances which he faced. Therefore, while alternatives did exist, there was nothing unreasonable about the alternative elected by the officer under these circumstances.”
 
 Stroik,
 
 699 So.2d at 1079.
 

 In its reasons for judgment, the trial court recognized that Sgt. Hessler was engaged in a lethal confrontation with a gunman. The evidence reveals that he chose a method of action to prevent Mr. Hawkins from injuring or killing other persons, if not Sgt. Hessler himself. The fact that other alternative methods may have been available is of no moment, and holding him to a single alternative is contrary to the law.
 

 
 *1232
 
 |31F. Physical size, strength and weaponry of suspects:
 

 The trial court found this factor to be inapplicable because Sgt. Hessler was not in close proximity or contact with Mr. Hawkins. This finding totally ignores the fact that Mr. Hawkins was firing a weapon at the time Sgt. Hessler confronted him.
 

 G. Exigency of the moment:
 

 To arrive at its conclusion that Sgt. Hes-sler did not have to act as quickly as he did, the trial court again notes that no one else was on the street at the time, implying that Mr. Hawkins was merely shooting at air, and that Sgt. Hessler had been drinking and was not capable or did not take the time to determine that Mr. Hawkins was not the aggressor. We have already discussed at length the fact that there is no proof that Sgt. Hessler was impaired due to alcohol. Further, applying the known undisputed facts to the law in 2000, Mr. Hawkins was very much the aggressor.
 

 As the Court stated in
 
 Mathieu,
 
 any time officers face the need to approach and arrest suspects they believe are armed and dangerous they must “make a quick decision under extremely charged circumstances.”
 
 Mathieu,
 
 646 So.2d at 326. This entire event, from the time Sgt. Hes-sler first saw Mr. Hawkins until the fatal shot was fired, could not have taken more than a minute. There is no dispute that Mr. Hawkins was armed and firing down the street. We find Sgt. Hessler’s actions to be totally reasonable in light of the totality of the circumstances.
 

 ASSIGNMENT OF ERROR NO. 7:
 

 Because we find that the trial court erred in finding liability on the part of Sgt. Hessler, this assignment of error is moot.
 

 | ¡¡¡.CONCLUSION:
 

 Judge Schott dissented from the majority in the
 
 Stroik
 
 case at the appellate court level. He stated in part:
 

 I respectfully submit that this is a classic example of the hard case producing bad law. Anyone who considers the facts of this case is bound to sympathize with this ... plaintiff.... But neither the facts nor the law support the imposition of fault on the part of Officer Ponseti or the City of New Orleans. The majority opinion sends the wrong message to the police. Don’t act quickly and aggressively in trying to apprehend armed and dangerous criminals because of the very rare possibility that one of them might turn out to be an innocent hostage! This kind of a rule ties the hands of the police and imperils the safety of the general public.
 

 Stroik v. Ponseti,
 
 96-0842, 96-1500 (La. App. 4 Cir. 11/6/96), 683 So.2d 1342, 1352.
 

 After carefully examining the record evidence, we find the totality of the circumstances surrounding the shooting in this case clearly demonstrates that the trial court was manifestly erroneous in finding Sgt. Hessler breached his duty of reasonable care. Accordingly, we reverse.
 

 REVERSED.
 

 [1]
 

 . The record does not contain a judgment denying defendants’ exception; however, defendants assert in their appellate brief that the trial court erred in doing so.
 

 [2]
 

 . This Court could not find a ruling in the record on the tender of Jim Bowman.
 

 [3]
 

 . The officer and his girlfriend that Sgt. Hes-sler, Sgt. Catalanotto and Ofc. Scanlan were to meet in the French Quarter had told the trio that the suspect had injured his arm and was possibly wearing a bandage.