673 So.2d 1181 (1996)
Lynn Gansar ZATARAIN
v.
WDSU-TELEVISION, INC. and John F. Carpenter.
No. 95-CA-2600.
Court of Appeal of Louisiana, Fourth Circuit.
April 24, 1996.
*1182 Richard A. Goins, Janis Van Meerveld, Michael M. Duran, Adams and Reese, New Orleans, for Plaintiff/Appellant.
Harry Rosenberg, M. Nan Alessandra, Thomas H. Kiggans, David M. Korn, Phelps Dunbar, L.L.P., New Orleans, for Defendants/Appellees.
Before LOBRANO and PLOTKIN and MURRAY, JJ.
PLOTKIN, Judge.
Plaintiff Lynn Gansar Zatarain appeals a trial court judgment denying a motion for new trial following a jury verdict dismissing her suit against defendant WDSU Television, Inc. Ms. Gansar claims that her motion for new trial should be granted both under the peremptory grounds established by La. *1183 C.C.P. art. 1972(1) because the verdict is "clearly contrary to the law and the evidence," and under the discretionary grounds of La.C.C.P. art. 1973 because of alleged attorney misconduct and improper exclusion of evidence.

Facts
Ms. Gansar was employed by defendant WDSU as a reporter and news anchor for almost ten years, until negotiations to renew her contract were terminated in November of 1992. Ms. Gansar claims that at the time the negotiations terminated, she had accepted a contract offer, which was later withdrawn on the basis of illegal discrimination. WDSU claims, on the other hand, that Ms. Gansar had presented the company with an unreasonable "counteroffer," requesting that her contract be modified to allow her to work fewer hours for more money, and that the contract negotiations were terminated because company officials perceived that Ms. Gansar was not negotiating in good faith.
Although the record reflects that the parties vehemently disagree on many of the particulars concerning the series of events leading up to the termination of the contract negotiations, they agree on the following facts. In the Spring of 1992, Ms. Gansar had for approximately two years, over some level of protest, been anchoring all three major newscasts for WDSUat 5 p.m., 6 p.m., and 10 p.m. Typically, Ms. Gansar's work day started at 3 p.m. and concluded around 11 p.m., some eight hours later. Ms. Gansar considered this situation both unfair and stressful because none of the other anchors worked three shows; she felt that she should be required to anchor only two newscasts a night, which would free her to do more live reporting.
Sometime in the Spring of 1992, while Ms. Gansar was anchoring these three newscasts, she decided that she wanted to have a baby. When she did not become pregnant within a few months, she sought fertility treatments. In order to facilitate those treatments, Ms. Gansar requested certain concessions from her employer, including reduced hours and permission to come to work later than was normally required in order to receive specifically-timed fertility injections. All of Ms. Gansar's requests for "accommodations" had been granted by WDSU; Ms. Gansar continued to anchor all three newscasts.
During this same time period, Ms. Gansar entered into negotiations with WDSU to renew her personal services contract, which would expire on November 30, 1992. WDSU made two different offers to Ms. Gansar to renew that contract. The first offer was rejected by Ms. Gansar, through her agent, Eddie Sapir, because the salary was too low and because the two-year contract contained a clause allowing WDSU to terminate the contract after the first year. Thereafter, WDSU made a second offer, meeting Ms. Gansar's salary demands and omitting the termination clause. Nevertheless, the parties were unable to reach an agreement, and Ms. Gansar was informed of her termination on November 11, 1992.

Peremptory grounds
La.C.C.P. art. 1972 requires a trial court to grant a motion for new trial if it finds that the jury verdict is contrary to the law and evidence. Although the granting of a new trial is mandatory under those circumstances, the jurisprudence interpreting the provision recognizes the trial judge's discretion in determining whether the evidence is contrary to the law and evidence. Generally, a trial judge should grant a motion for new trial because a jury verdict is contrary to the law and evidence when the judge's examination of the record, while exercising his discretion, convinces him that the judgment would result in a miscarriage of justice. Perkins v. K-Mart Corp., 94-2065 (La.App. 1st Cir. 6/23/95), 657 So.2d 725, 731, writ denied, 95-2058 (La. 11/13/95), 662 So.2d 477. Further, a motion for new trial based on a contention that the verdict is contrary to the law and evidence should be denied if the verdict is supportable by any fair interpretation of evidence. Gibson v. Bossier City General Hospital, 594 So.2d 1332, 1336 (La.App. 2d Cir. 1991). A trial court judgment denying a motion for new trial should not be reversed unless the appellate court finds that the trial court abused its discretion. Perkins, 657 So.2d at 731.
*1184 Ms. Gansar's argument in her brief to this court that the jury verdict in this case is clearly contrary to the law and evidence is based primarily on Mr. Sapir's trial testimony to the effect that John Carpenter, WDSU's station manager, indicated to him that the parent company did not want a news anchor who might have a "problem" pregnancy. Ms. Gansar claims that Mr. Sapir's testimony is uncontroverted and thus is entitled to a presumption of truth. WDSU attacks the primary premise underlying Ms. Gansar's argument on this issue by stating that Mr. Sapir's testimony was controverted both by Mr. Carpenter's testimony and by documentary evidence presented in the form of a letter memorializing the final step of the contract negotiations.
Mr. Sapir's testimony that Mr. Carpenter told him that WDSU's decision to terminate the contract negotiations with Ms. Gansar was based on the fact that WDSU did not want an anchor with a potentially problem pregnancy is sufficient, Ms. Gansar claims, to prove that WDSU and its parent company, Pulitzer Broadcasting Co., violated Louisiana law prohibiting employment discrimination based on pregnancy, childbirth, or related medical conditions. LSA-R.S. 23:1008.
We have closely reviewed the record to determine whether the jury's verdict was contrary to the law and evidence, as Ms. Gansar claims. For the reasons stated below, we find that the jury verdict was based on a pure credibility call between two groups of witnesses testifying to two different versions of the series of events, in terms of meetings and telephone calls, leading up to the withdrawal of the contract offer. Because the jury verdict in this case is supportable by a fair interpretation of the evidence, we find that the trial judge did not abuse his discretion in denying the motion for new trial on the basis of Ms. Gansar's claim that the jury verdict is contrary to the law and evidence.
The record reflects that on either November 3, 1992 or November 10, 1992, a final face-to-face meeting between the parties occurred in Mr. Sapir's office; that pivotal meeting was attended by Ms. Gansar, Mr. Sapir, Ms. Gansar's husband, and Mr. Carpenter, who was handling the direct negotiations on behalf of WDSU and Pulitzer.
The parties differ greatly concerning the nature of the information relayed by Ms. Gansar to Mr. Carpenter during the course of that meeting. Ms. Gansar, who claims the meeting occurred on November 3, 1992, testified that she and her husband attended the meeting, expecting to sign the second contract offered by WDSU, which she had previously accepted through Mr. Sapir. Mr. Carpenter, who claims the meeting occurred on November 10, 1992, said that the meeting was never intended, and never could have been intended, to be a contract signing because no other WDSU employees were present to witness the contract, as would have been necessary, but that the meeting was part of the continuing negotiation process.
At any rate, Ms. Gansar related information concerning her pregnancy attempts and fertility treatments to Mr. Carpenter at that time. Ms. Gansar claims that she simply informed Mr. Carpenter that her doctor had recently learned during a convention that her pregnancy efforts could be enhanced by a reduction in her job-related stress. She stated that she was unaware of the specifics anticipated by her doctor at that point, and that Mr. Carpenter simply requested that she contact her doctor, then get back to him about the specifics. She fulfilled Mr. Carpenter's request, she claims, and called him later in the week to tell him about her doctor's recommendations. Ms. Gansar's testimony does not detail the particulars of what she told Mr. Carpenter, only that she relayed information to Mr. Carpenter. At a different point in her testimony, she stated that the doctor told her that she should temporarily cut her hours dramatically for approximately a four-month period in order to maximize her chances of becoming pregnant. On November 11, 1992, Mr. Carpenter called her and told her the contract offer was being withdrawn, but failed to tell her why, Ms. Gansar said.
Mr. Sapir's testimony supports Ms. Gansar's version of the above events, but also relays the following additional information. Mr. Carpenter called him on November 11, 1992, after he had spoken to Ms. Gansar, and *1185 told him that the contract offer was being withdrawn. When he asked him for a reason, Mr. Carpenter indicated that Pulitzer did not want an anchor person who might undergo a "problem" pregnancy, Mr. Sapir says. Mr. Sapir also claims that Ms. Gansar never requested that any special provisions to facilitate her pregnancy and fertility efforts be included in her contract with WDSU, but that she only requested some simple "accommodations." In fact, according to Mr. Sapir, Ms. Gansar suggested that WDSU simply extend her old contract during the period of the requested accommodations and enter a new contract only after she became pregnant.
Mr. Carpenter's version of the story is quite different. He claims that Ms. Gansar's statements at the meeting in Mr. Sapir's office, which he says occurred November 10, 1992, were presented as contract demands which he interpreted as a "counteroffer" to WDSU's second contract offer. Mr. Carpenter says that Ms. Gansar asked to be excused from anchoring the 5 p.m. newscast, and be allowed to come to work at approximately 5:30 p.m., do the 6 p.m. newscast, leave the station, return at approximately 9:30 p.m., do the 10 p.m. broadcast, then go home. Mr. Carpenter testified that Ms. Gansar wanted her contract to reflect these requirements, which essentially would have allowed her to work only about three hours a day rather than the standard eight hours per day. Moreover, Mr. Carpenter said, Ms. Gansar wanted WDSU to eliminate the standard "assignability" clause, which provided the station the necessary flexibility to assign any anchor to any show as it saw fit. Nevertheless, Ms. Gansar expected to be paid the amount which she had previously negotiated, approximately $350,000 for two years, which was the highest salary of any anchor in the area, Mr. Carpenter testified.
Mr. Carpenter said that he told Ms. Gansar that Pulitzer would probably not agree to her demands, but nevertheless promised to relay them to Ken Elkins, president of Pulitzer. The next day, in a telephone conversation with Mr. Elkins and Mary Lynn Roper, Pulitzer's vice-president of news, the decision was made to terminate contract negotiations with Ms. Gansar, Mr. Carpenter said. That decision was based on the belief that Ms. Gansar's contract negotiations were not in good faith and that Ms. Gansar was not dedicated to the best interests of the station. Ms. Gansar's desire to become pregnant, and the resulting fertility treatments and other problems, were simply "not an issue," Mr. Carpenter testified. Mr. Elkins and Ms. Roper corroborated this version of the story.
Mr. Carpenter's version of the events leading up to WDSU's termination of the contract negotiations, as corroborated by Mr. Elkins and Ms. Roper, reasonably supports the jury verdict dismissing Ms. Gansar's suit against WDSU. Thus, the trial court did not abuse his discretion in denying the motion for new trial on this basis.

Discretionary grounds
Ms. Gansar's arguments that she is entitled to a new trial on discretionary grounds are based on alleged attorney misconduct and alleged improper exclusion of relevant evidence. Generally, the determination of whether to grant a motion for new trial for discretionary reasons lies within the wide discretion of the trial court and should not be disturbed by an appellate court in the absent of a clear abuse of discretion. Hogan v. State Farm Automobile Insurance Co., 94 0004 (La.App. 1st Cir. 12/22/94), 649 So.2d 45, 51, writ denied, 95-0215 (La. 3/17/95), 651 So.2d 276.

Attorney misconduct
Ms. Gansar claims that WDSU attorney Harry Rosenburg committed attorney misconduct of such an egregious nature as to entitle her to a new trial when he referred to the fact that Ms. Gansar has made more money on stock investments after her dismissal by WDSU than she could have made anywhere else. That statement, Ms. Gansar claims, violated a direct court order prohibiting reference to her stock earnings. Moreover, the statement was designed to prejudice a jury of less-fortunate women concerning Ms. Gansar's position in life, Ms. Gansar claims.
WDSU argues that the statement did not violate the court order because it did not mention the amount of money Ms. Gansar earned on her stock investments. Further, WDSU says, the statement was an isolated *1186 comment in opening statements to which Ms. Gansar failed to object. Further, Ms. Gansar was later given an opportunity by the trial judge to request a curative instruction or to seek a mistrial. Ms. Gansar's failure to complain about the statement in a contemporaneous fashion should foreclose this court from considering Ms. Gansar's arguments on this issue on appeal, WDSU claims.
The record reflects that the trial court did offer Ms. Gansar an opportunity for either a curative instruction or a mistrial on the day the allegedly improper statements occurred and that Ms. Gansar requested neither. In light of the fact that Ms. Gansar waived a contemporaneous opportunity to correct any prejudice resulting from the statement, we find no abuse of the trial court's wide discretion in denying Ms. Gansar's motion for new trial on those grounds.

Admissibility of evidence
Ms. Gansar's claims concerning the trial court's alleged improper decisions excluding certain evidence are based on two things: (1) the exclusion of a Letter of Determination issued by the Equal Employment Opportunity Commission (EEOC), in which the EEOC concluded that WDSU likely discriminated against Ms. Gansar, and (2) the exclusion of evidence concerning an arbitration board decision that Ms. Gansar was entitled to severance pay under her contract.
Concerning the EEOC Letter of Determination, Ms. Gansar seeks to distinguish between a Letter of Violation in an Age Discrimination case, which she concedes is not admissible under applicable federal law and jurisprudence, and a Letter of Determination in a Title VII case such as this, which she says is admissible under federal law and jurisprudence. The Letter of Determination should have been admitted, Ms. Gansar says, because it contains findings of fact and because it was relevant to her case. WDSU cites federal cases concerning the admissibility of EEOC letters, saying that they are not admissible under federal law and jurisprudence.
We find no abuse of the trial court's discretion in excluding the EEOC Letter of Determination because the letter is clearly not admissible under La.C.E. art. 803(8)(b)(iv), which prohibits the admission of "[f]actual findings resulting from investigation of a particular complaint, case, or incident, including an investigation into the facts and circumstances on which the present proceeding is based or an investigation into a similar occurrence or occurrences" because they are hearsay. Thus, Ms. Gansar is not entitled to a new trial on those grounds.
Concerning Ms. Gansar's challenge of the trial court decision excluding evidence of a favorable arbitration decision finding that she was entitled to severance pay under her contract with WDSU, this court has previously reviewed that decision on supervisory writs and found no error in the trial court judgment because severance pay was not an issue in the state court suit. Ms. Gansar claims that it is an issue to the extent that LSA-R.S. 23:631 et seq. entitles her to recovery of penalties and attorney fees for WDSU's failure to pay her severance pay timely. In fact, she claims that WDSU has not yet paid those severance wages. WDSU relies on the "law of the case" doctrine to contest Ms. Gansar's arguments on this issue.
This court generally applies the "law of the case" doctrine when reviewing an issue decided on supervisory writs as part of the appeal of the case following a trial on the merits, except when it finds either that the previous decision is based on palpable error or that manifest injustice would result. Sharkey v. Sterling Drug, Inc., 600 So.2d 701, 705 (La.App. 1st Cir.), writs denied, 605 So.2d 1099, 1100 (La.1992). Because neither of those exceptions are present in the instant case, we stand by our previous decision finding the arbitration decision inadmissible in this case. Thus, we find no abuse of the trial court's discretion in denying Ms. Gansar's motion for new trial on this basis.

Conclusion
Accordingly, the trial court judgment denying the motion for new trial filed by Ms. Gansar is affirmed.
AFFIRMED.