MAX N. TOBIAS, JR., Judge.
hThe defendants/appellants, Robert Andrew Schiff and N.O.W. Properties, LLC,[1] appeal from a judgment arising out of a failed business venture between Schiff and the plaintiff/appellee, Lidia Pollard (“Ms. Pollard”). After reviewing the record and applicable law, we amend the judgment and affirm as amended.
This matter involved a partnership between Mr. Schiff and Ms. Pollard that resulted in the creation of N.O.W. Properties, LLC, a limited liability company. Mr. Schiff is a commercial litigator with a degree in finance, who lives in Santa Monica, California. At some point, Mr. Schiff ceased the practice of law and began collecting money from a trust fund set up by his deceased father.
Prior to the spring of 2007, Ms. Pollard had worked her entire life as a merchant engineer aboard ocean-going vessels. Ms. Pollard was then 60 years old and, having been born and raised in Argentina, English was not her first language.
1 gDuring a trip to visit a property he purchased in the Lakeview section of New Orleans in February 2007, Mr. Schiff noticed some post-Katrina renovation work done by Ms. Pollard. Mr. Schiff approached Ms. Pollard and, being impressed with the work she was performing, suggested they discuss doing business together. Mr. Schiff was from California and wanted to invest in the city’s rebuilding efforts after Hurricane Katrina. Ms. Pollard was very excited about the idea. Mr. Schiff came to Ms. Pollard’s home and handwrote a contract on a paper from a spiral notebook. At some point, this con *51 tract became known as the “napkin agreement.” [2]
At the house with Ms. Pollard and Mr. Schiff was Renee Parks, who had known Ms. Pollard for most of their lives, and was living with Ms. Pollard. Ms. Parks testified at trial and corroborated all material aspects of Ms. Pollard’s testimony.[3]
Pursuant to the agreement, Schiff would put up the money (initially $200,000) to purchase and renovate properties that would then be “flipped” (resold), preferably within “two months of its purchase date.” Ms. Pollard was to locate suitable homes (with the aid of Ms. Parks) and supervise the renovations. Once renovations were complete, the properties were to be sold with Schiff, on the one hand, and Ms. Pollard, on the other hand, splitting equally all net profits.
|sThe first property was purchased in March 2007, and a total of 12 properties, four of which were duplexes or doubles, were purchased and renovated. through August of 2009. These properties were all purchased in Mr. Schiff s name.[4] This is because of a conversation Mr. Schiff had with an individual (referred to by Ms. Pollard as the “no-doc loan guy”), who explained that mortgages could be placed on the properties if they were purchased in Mr. Schiffs name alone and not in the name of N.O.W. Properties, LLC. Although the contract called for the properties to be “flipped” within two months, at some point early in the venture, Mr. Schiff unilaterally decided to rent the completed houses rather than sell them. Ms. Pollard did not want to do this, but went along with the plan because Schiff provided the money; she' considered herself to be “stuck” with the arrangement.
Schiff expected Ms. Pollard to manage the rental properties by securing tenants, collecting rent, and making repairs to the properties as requested by the tenants. Mr. Schiff also claimed Ms. Pollard was “in charge” of the partnership’s books and records, despite Mr. Schiff having a finance degree and possession of all the receipts and bank records. According to Mr. Schiff, Ms. Pollard was expected to do this without any monetary remuneration; her only consideration was being permitted to live in one of the properties for six months (paying $2,000 per month in rent) and $40,000 in deferred compensation (which she allegedly never received). Ms. Pollard testified that she often used her own resources (or resources |4borrowed from others) to purchase materials and supplies for the partnership. She was not, however, promptly or fully, reimbursed; often, she was not reimbursed at all.
Mr. Schiff admitted at trial that, from the very inception of the business relationship, he never intended Ms. Pollard to be a partner:
Q. Tell me what your intent was about how to organize and run your business venture that you started with Lidia Pollard in 2007.
*52 A. I intended to be a sole proprietorship and that she was going to be a supervisor on the properties.
Further, Mr. Schiff stated that, although he introduced Ms. Pollard to third parties and financiers as his “partner,” he had never informed her that the business was a “sole proprietorship” and that she was merely a “supervisor.” Conversely, Ms. Pollard testified that she and Mr. Schiff were partners; she was never told otherwise.[5]
Ms. Pollard and Ms. Parks testified that all the receipts and bank records were first sent to Mr. Schiff by telefax. However, later a problem occurred with that method so Mr. Schiff would pick them up whenever he came to town or they were sent to him in California by Federal Express. Ms. Parks herself put some of them into manila envelopes. She believed that Mr. Schiff took them with him because she did not see them again. Mr. Schiff, however, testified that Ms. Pollard kept all the receipts.
| ,-Ms. Parks confirmed Ms. Pollard’s testimony regarding reimbursements. Ms. Pollard often needed to use her own money to purchase materials and supplies and then seek reimbursement from Schiff. However, she was not always repaid immediately. Sometimes she was partially reimbursed or sometimes not at all. Ms. Pollard testified that she had to borrow large sums of money from her father, who eventually filed for bankruptcy.
Ms. Parks stated that the “napkin agreement” called for a house to be purchased, renovated, and sold, at which time another house would be bought. However, she could not recall any sales except for the house on Filmore Avenue in New Orleans that was sold after the end of the business venture.
Ms. Parks testified that Ms. Pollard grew increasingly dissatisfied with the arrangement she had with Schiff. She was worried about the absence of reimbursements from Schiff. She was also worried that the properties were not being sold and she would not be making the money she believed she would receive pursuant to the original agreement.
As Ms. Pollard’s displeasure grew, Ms. Parks became concerned about the handwritten contract between the parties. Ms. Parks asked Mr. Schiff to give Ms. Pollard something more formal, despite Mr. Schiff s assurances that the “napkin agreement” was valid and enforceable in the court of law. Ms. Parks asked Mr. Schiff to prepare a typewritten version of the “napkin agreement.” She was no longer living with Ms. Pollard but was under the impression that the two agreements would be the same. Ms. Parks told Ms. Pollard that Mr. Schiff was typing up something more formal and that she should sign it. However, Ms. Parks did not see it before it was sent to Ms. Pollard. Ms. Pollard signed the typewritten agreement on 15 July 2009, more than two years after the business venture began.
| ñD espite assurances that no substantial changes existed between the two agreements, the typewritten agreement specifically contained terms allowing the properties to be rented. These terms were neither addressed in the “napkin agreement” nor contemplated by the parties in March 2007.
The typewritten agreement also stated:
This Partnership Agreement is between Lidia Pollard (“Lidia”) and Rob *53 ert Schiff (“Robert”), both being referred to herein as “partners”. This formally written agreement is to replace an agreement written on a napkin when the partners first met and any other prior written or oral agreements between them. [Emphasis supplied.]
By the time she had renovated the twelfth property in September 2009, Ms. Pollard had had enough, especially since Schiff had completely stopped funding the operation. By this point, Ms. Pollard was paying for all of the renovations herself, and Schiff had stopped reimbursing her. The parties agreed to end their business arrangement effective 1 September 2009.
In an effort to amicably end their relationship, Mr. Schiff proposed that Ms. Pollard obtain a comparative market analysis (“CMA”) for each of the 12 properties. Ms. Pollard obtained CMAs from a real estate broker, Janie Armato, who prepared recommended prices for the properties totaling $2.9 million, and sent them to Mr. Schiff. In a letter dated 29 September 2009, Mr. Schiff proposed a settlement to Ms. Pollard. When valuing the assets, Mr. Schiff also used a total value of approximately $2.9 million, which was similar to the total value of the CMAs. Later, in 2013 (after suit was filed and trial dates continued at Schiffs request), Mr. Schiff retained the services of a certified real estate appraiser, who appraised the market value of the properties in 2009 at approximately $2.3 million.
|7The parties were unable to reconcile their differences. Ms. Pollard finished the last property in' April of 2010 (541 Filmore Avenue), staged the property for sale, and found a buyer. Once they were ready to go to Act of Sale, Schiff refused to give Ms. Pollard her fifty percent share of the profit from that property. Mr. Schiff proceeded to sell the property in April and pocketed all the profits. At trial, he justified this by totaling his expenses on all the properties before determining the profits instead of using the Filmore property alone.[6]
Once the parties were unable to reach an amicable settlement, Ms. Pollard filed suit against Schiff in 2010, seeking, inter alia, half of the profits from the sale of the Filmore property and an accounting of the partnership.[7] The matter was tried without a jury on 16-18 April 2013. Schiff filed post-trial motions, including a motion to admit approximately 100 documents that he forgot to admit at trial, as well as motions to admit newly discovered evidence and for new trial. On 28 June 2013, Mr. Schiff was cross examined on the newly admitted documents. The other motions were denied.
The trial court rendered judgment on 2 August 2013, finding in favor of Ms. Pollard. The court found that the parties had entered into a contract and that Schiff had breached the “referenced contract,” without specifying the contract to which is referred. The trial court also held “that it was Mr. Schiffs intention to breach this contract from the inception,” and that Mr. Schiff was “in bad faith and liable for damages under LA [sic] C.C. Art. 1997, as well.”[8]
laMs. Pollard was awarded a total of $685,176.52, plus interest on the total *54 amount from 1 September 2009, consisting of the following elements of damages:
$373,312.80 1. 50% of profits
$188,367.72 2. Reimbursable expenses
$ 897.00 3. Truck expenses
$ 50,000.00 4. Property management
$ 5,000.00 5. Utilities
$ 11,800.00 6. Accounting
$ 55,799.00 7. Personal funds
Schiff appealed the judgment assigning seven alleged errors committed by the trial court:
• The trial court erred in finding that Schiff, in bad faith, breached an agreement that was replaced and superseded by a subsequent agreement.
• The trial court relied on the CMAs and not the appraisals.
• The CMAs were incorrect; the trial court erred in adopting them.
• The court erred by relying on an accounting that contained gross deficiencies.
• Ms. Pollard did not carry her burden of proof regarding the amount of reimbursable expenses.
• The trial court erred by refusing to admit Ms. Pollard’s voicemail message, which was then proffered into evidence.
• The trial court erred by refusing' to grant Sehiffs motion for new trial based on newly discovered evidence that Ms. Pollard lied at trial.
In civil cases, the appropriate standard for appellate review of factual determinations is the manifest error-clearly erroneous standard, which precludes | nthe setting aside of a trial court’s finding of fact unless that finding is clearly wrong in light of the record reviewed in its entirety. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). Louisiana law adopts a two-part test for the reversal of the factfinder’s determinations: (1) the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and (2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous). Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). “The- issue to be resolved by the reviewing court is not whether the trier of fact is right or wrong but whether the factfinder’s conclusion was a reasonable one.” Syrie v. Schilhab, 96-1027, p. 4 (La.5/20/97), 693 So.2d 1173, 1176. Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder’s, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Rosell, 549 So.2d at 844.
I.
In his first assignment of error, Schiff contends that the trial court relied on the 2007 “napkin agreement” instead of the 2009 typewritten agreement. The trial court stated: “The Court finds that Defendant, Robert Schiff, breached the referenced contract at its inception and throughout the term governed by the contract,” without identifying the contract on which it relied. However, the trial court later stated that “Schiff breached the contract by not selling the referenced properties. Instead, Defendant decided to rent the properties.” The primary and significant difference between the two contracts was the addition of language in 2009 re *55 garding rentals, something not contemplated in 2007. As a result, we agree | inwith Schiff that the trial court relied on the 2007 agreement, but do not find that the court erred in doing so.
Schiff points to the language in the 2009 agreement wherein it states that it is to “replace” the 2007 agreement. Throughout his brief, Schiff adds the word “superseding,” arguing that the 2009 agreement retroactively replaced the earlier one, as if the 2007 agreement never existed. In other words, by renting the houses, as provided for in the 2009 agreement, his failure to sell the properties did not breach the contract.
Black’s Law Dictionary (9th Ed.) defines “supersede” as follows:
To annul, make void, or repeal by taking the place of.
Even if we accept the idea that the 2009 agreement rendered the 2007 agreement invalid, the 2009 agreement does not use the word “supersede.” In addition, nothing indicates that the latter agreement voided the 2007 agreement as if it never existed. By so arguing, we find that the contract is ambiguous.
The 2009 agreement must be strictly construed against Schiff who drafted it. La. C.C. arts. 2056-2057; U.S. Abatement Corp. v. Mobil Exploration & Producing U.S., 79 F.3d 393, 400 (5th Cir.1996) (“Under Louisiana law, ambiguous clauses are construed against the drafter.”); Kuhn v. Stan A. Plauche Real Estate Co., Inc. 249 La. 85, 93, 185 So.2d 210, 213 (1966) (Any “ambiguity or contradiction which existed in the language of the contract must be construed against the party who prepared the contract.”) If the ambiguity “arises from lack of a necessary explanation that one party should have given ... the contract must be interpreted in a manner favorable to the other party.” La. C.C art. 2057; Foshee v. Georgia Gulf Chemicals & Vinyls, L.L.C., 09-2477, pp. 3-4 (La.07/06/10), 42 So.3d 346, 348.
|nAs Ms. Parks testified, she spoke with Mr. Schiff and was told that the two contracts were identical; that was the only reason she told Ms. Pollard to sign it. And while Schiff argues that the parties agreed that holding onto the properties and renting them would be a better investment, both Ms. Pollard and Ms. Parks directly contradict this assertion. Pursuant to La. C.C. art. 1848:
Testimonial or other evidence may not be admitted to negate or vary the contents of an authentic act or an act under private signature. Nevertheless, in the interest of justice, that evidence may be admitted to prove such circumstances as a vice of consent or to prove that the written act was modified by a subsequent and valid oral agreement.
In this instance (and as seen throughout the trial), the trial court relied on the testimonial evidence from Ms. Pollard and Ms. Parks to prove that Ms. Pollard never agreed to rent the properties in lieu of selling them.[9] The court made credibility determinations, believing Ms. Pollard and Ms. Parks over Mr. Schiff. We cannot say that the court committed manifest error by relying on the 2007 agreement.
However, we do find that Mr. Schiff also breached the 2009 contract that specifically identifies the parties as “partners.” Based on Mr. Schiffs own testimony, he never intended for them to. be partners; the business was a sole proprietorship. Ms. Pollard’s testimony, as confirmed by *56 Ms. Parks, was that she and Mr. Schiff were entering into a partnership from the beginning. Mr. Schiff introduced her as his partner to third parties. Thus, both contracts were breached from their inception, regardless of which one was in effect. Further, we reject the 112assertion that the 2009 agreement somehow ratified Schiff s actions that were taken unilaterally two years before. If the 2009 agreement has any validity at all, it was only in effect from mid-July 2009 until 1 September 2009, not from 2007 forward.
We cannot say that the trial court was manifestly erroneous by enforcing the 2007 contract and finding a bad-faith breach thereof after hearing the testimony and examining the evidence. This assignment of error is without merit.
II.
Next, it is alleged that the trial court erred by relying on the CMAs prepared by a real estate agent in 2009 and not the appraisals prepared by a certified appraiser in 2013. The trial court found that the CMAs prepared in 2009 were the best evidence of the value of the properties at that time and that Schiff agreed to the figures submitted by Ms. Pollard. In valuing the properties in his letter of 29 September 2009, Schiff used a total value of $2,926,816. The trial court used a slightly higher figure of $2,970,300 as determined by the CMAs.
Schiff argues that the amount of $2,926,816 was used only as an attempt to settle the matter with Ms. Pollard. In his letter of 4 September 2009, Mr. Schiff proposed that Ms. Pollard give him a value for each property and if he disagreed, he would get a broker’s opinion. If Ms. Pollard disagreed to those values, then the parties would hire an appraiser. However, Mr. Schiff did nothing until shortly before trial, tacitly agreeing to the figures submitted by Ms. Pollard in 2009.
Schiff relies on the case of Katner v. Katner, 09-0974 (La.App. 4 Cir. 12/23/09), 28 So.3d 566, for the proposition that appraisals by a Louisiana licensed real estate appraiser should be relied upon over those prepared by a real estate broker. We noted in Katner that a trial judge’s determination of value is a finding |iaof fact, thereby triggering the manifest error/clearly wrong standard of review. Id. at p. 5, 28 So.3d at 571. In Katner, the trial court accepted the appraisal prepared by the Louisiana licensed appraiser but refused to admit into evidence the appraisal prepared by the real estate broker. Id. at pp. 5-6, 28 So.3d at 571. We reviewed that decision under the abuse of discretion standard, id. at pp. 6, 28 So.3d at 572, finding no such abuse.
In the instant case, Ms. Pollard’s CMAs were admitted into evidence by the trial court without testimony. Schiff presented John S. Anderson, a certified real estate appraiser, whose appraisals totaled approximately $2.3 million and were prepared in January 2013. Mr. Anderson testified that he was told to appraise the properties as of 1 September 2009. Mr. Anderson admitted that valuing property is a subjective process. He also stated that he had to make the assumption that the condition of the properties in 2013 was the same in 2009.
In Bellard v. American Central Ins. Co., 07-1335, p. 28 (La.4/18/08), 980 So.2d 654, 673, the Court stated:
In considering expert testimony, the trier of fact may accept or reject, in whole or in part, the opinion expressed by an expert, even to the point of substituting its own common sense and judgment for that of an expert witness, where, in the factfinder’s opinion, such *57 substitution appears warranted by the evidence as a whole.
We find that the trial court was neither manifestly erroneous nor abused its discretion by relying on the CMAs.[10] This assignment of error is without merit.
JuIII.
The next assignment of error is closely related to the previous one. Here, Schiff maintains that the trial court erred by relying on the CMAs because they are inaccurate. We find the inaccuracy to be of no consequence, as the trial court obviously found. Schiff argues that the trial court erred in rejecting the “uncontrovert-ed expert opinion of a licensed real estate appraiser.” As stated above in Bellard, the trial court may totally reject an expert’s opinion. Apparently the trial court rejected Mr. Anderson’s appraisals, something that is well within its discretion. We find no error.
IV.
Schiff next argues that the trial court erred by relying on the accounting prepared by Marjorie R. Corcoran, a CPA, retained by Ms. Pollard. The court found Ms. Corcoran’s testimony credible and accepted it in all respects.
Schiff first contends that the accounting was based on the wrong agreement between the parties, namely the 2007 handwritten contract and not the 2009 typewritten contract. We have already discussed this issue, supra, rejecting the argument.
It is next pointed out that the accounting was faulty because it used the values found in the CMAs and not the certified appraisals. Again, this argument has been discussed and found without merit.
Finally, it is argued that the accounting is false because Ms. Corcoran did not have the financial statements for an account at Regions Bank, account number 2974 (“Regions 2974”). As a result, Schiff argues that Ms. Pollard’s accounting is | ^incomplete. We note that Ms. Corcor-an’s accounting is the only one in the record. The trial court stated that Ms. Pollard was required to retain Ms. Corcor-an’s services to prepare an accounting, when Schiff failed to provide the same despite numerous requests. This is the reason that the trial court awarded Ms. Pollard the amount of $11,800, the sum she paid Ms. Corcoran.
Ms. Corcoran used all the receipts, financial statements, tax returns, and bank records that were provided to her; Ms. Corcoran did not have the financial statements for Regions 2974.[11] Additionally, the Filmore property was sold in 2010, after the accounting was completed; therefore, the accounting did not include the profit of $192,000 made by Schiff on that sale.[12]
Ms. Corcoran was deposed after she completed her initial accounting. Following that, she was provided copious bank records of which she was unaware; a second accounting was produced, thereby in *58 creasing the fee paid by Ms. Pollard. Before Ms. Corcoran took the stand at trial, the court denied a motion by Schiff to exclude Ms. Corcoran’s report. Schiff argued that because the report changed after her deposition, those changes and her testimony about same should be excluded. The trial court noted that Mr. Schiff kept producing documents after the deposition so, of course, the report would change.
Mr. Schiff knew at the time of Ms. Cor-coran’s deposition that records from Regions 2974 were not included in the work Ms. Corcoran performed; he should have objected then or sent the records to Ms. Pollard after the fact as he did with |1fihis other bank records that were previously excluded from discovery. He was free to produce his own accounting to include missing information, and other alleged “missing” expenses that should have been credited to Schiff,[13] to refute the one prepared by Ms, Corcoran, but did not.[14]
This assignment of error is without merit.
V.
The next assignment of error concerns the award for reimbursement of expenses in the amount of $188,367.72. Schiff first argues that Ms. Pollard did not produce receipts marked “paid” in order to prove she had incurred all the expenses she claimed.[15] The trial court found that Ms. Pollard had submitted evidence of reimbursable expenses totaling $228,572. By stipulation of the parties, $40,204 in total deductions was made, leaving a balance of $188,868 in reimbursables. Ms. Pollard received an award of $188,367.72 for that item of damages. The trial court also awarded Ms. Pollard $897 in truck maintenance expenses. This latter amount is not challenged by Schiff.
We have reviewed the evidence in question, which consists of sales receipts, checks written by Ms. Pollard, and invoices from third parties. Some of the |17invoices are marked paid and others are not. Some of the receipts and invoices do not indicate how they were paid and by whom (“undocumented”). Except for several invoices/receipts totaling $351.79, they are all segregated by property for which the money was spent.[16]
Schiff contends that Ms. Pollard cannot recover for the amounts charged to unidentified credit cards (although the trial court specifically found that these cards did not belong to the business), and for the undocumented invoices. Schiff relies on the case of Provenzano v. Populis, 428 *59 So.2d 556, 558 (La.App. 4th Cir.1983), wherein we stated:
The proper basis for determining the cost of the improvements are the invoices and the statements of accounts expended. Claimant must produce the best evidence available in support of his claim. Breaux v. Laird, 230 La. 221, 88 So.2d 33 (1956); Dikert v. Ruiz, 231 So.2d 633 (La.App. 4th Cir.1970). A bill or invoice for materials used when accompanied by proof that it was paid is sufficient proof to justify an award therefor. Dikert v. Ruiz, supra.
Schiff argues that without evidence that the various invoices were paid, Ms. Pollard cannot recover because she has not carried her burden of proof.
We do not interpret Provenzano in the same manner as Schiff. The case clearly states that the claimant must produce the best evidence available to support his/her claim, not that paid invoices and/or testimony from the sellers were the only method by which one could support a claim. Ms. Pollard submitted a voluminous amount of invoices that were in her possession. She and Ms. Parks both testified that all invoices were sent and/or given to Schiff. They further | ^testified that Ms. Pollard personally paid for numerous items for the properties without receiving reimbursement. One would assume that Schiff kept these invoices for tax purposes and, thus, would already know the correct amount owed to Ms. Pollard. However, Mr. Schiff testified that he did not have these receipts. Obviously, the trial court believed the testimony of Ms. Pollard and Ms. Parks over that of Mr. Schiff.
The 2007 contract states that Ms. Pollard would be reimbursed for spending her money for the partnership. It further specifies that receipts of all expenses would be sent to Mr. Schiff monthly. The contract also provides that if the fund is dissolved by Mr. Schiff (pursuant to the contract, Mr. Schiff would place $200,000 in a Regions account), Ms. Pollard “will be due all the money that has accumulated and is due her up to that point in accordance with everything written herein.”
Schiff presented no countervailing evidence to dispute Ms. Pollard’s claim (other than the amounts previously deducted), and testified that Ms. Pollard would be in the best position to know if she was properly reimbursed. “Determining the appropriateness of evidence is the province of the trial court, and such a determination will not be overturned absent an abuse of discretion.” Yokum v. Pat O’Brien Bar, Inc., 12-0217, p. 11 (La.App. 4 Cir. 8/15/12), 99 So.3d 74, 82, citing Duncan v. Bartholomew, 11-0855, p. 19 (La.App. 4 Cir. 3/14/12), 88 So.3d 698, 712. We find no such abuse overall, but deduct the sum of $351.79 from the total amount of reimbursements awarded as the record fails to reflect that this amount was invested into the partnership.
VI.
The next assignment of error concerns the trial court’s exclusion of a voice mail message left by Ms. Pollard on Mr. Schiff s phone. The court ruled that the | ^message was irrelevant to the issues at hand, but allowed Schiff to proffer the evidence. See La. C.C.P. art. 1636. Schiff argues that the message discredits Ms. Pollard’s claim that he defrauded her and failed to reimburse her for the now-claimed expenses. Schiff further contends that the message contradicts the court’s finding of bad faith.[17]
The trial court stated:
*60 I don’t care if they love each other or hated each other, if she’s due the money, she’s due the money; if, you know, she’s not due the money, she’s not due the money.
* ⅜ *
I don’t care what her state of mind was.
Mr. Schiff testified that Ms. Pollard was leaving “nasty messages” on his phone all the time and, as revealed by some of the correspondence between them, their conversations were likewise unpleasant. The fact that Ms. Pollard tried to get her money “with honey rather than vinegar” does, not mean that she was abandoning her claim. Again, the admission of evidence is reviewed, on an abuse of discretion standard. We find no such abuse by the trial court in this instance.
VII.
The last assignment of error concerns the trial court’s denial of Schiff s motion for new trial pursuant to La. C.C.P. arts. 1972(1) and 1973. Schiff alleges that new evidence was obtained that proved false testimony was given supporting a $20,000 investment in the venture and $30,000 in compensation. Schiff maintains that on 23 November 2008, his sister, Lori M. Chem-la, made out a $50,000 check | anto “Linda” Pollard. Ms. Pollard deposited the check into her personal account at Liberty Bank on 1 December 2008.[18] At trial, Ms. Pollard testified that she believed this money came from her retirement and was contributed to the partnership. It was not until after trial that Liberty Bank provided copies of the check and Ms. Pollard’s bank records pursuant to an earlier subpoena from Schiff.
La. C.C.P. arts. 1972 and 1973 provide grounds for a new trial. La. C.C.P. art. 1972(1) states that a new trial may be granted when the judgment appears contrary to the law and the evidence, while article 1972(2) provides a new trial “[w]hen the party has discovered, since the trial, evidence important to the cause, which he could not, with due diligence, have obtained before or during the trial.” [19] La. C.C.P. art. 1973 further allows a new trial “if there is good ground therefor, except as otherwise provided by law.” A trial court’s judgment denying a motion for new trial’should not be reversed unless appellate court finds that trial court abused its discretion. Zatarain v. WDSU-Television, Inc., 95-2600, p. 3 (La.App. 4 Cir. 4/24/96), 673 So.2d 1181, 1185.
We find no abuse of discretion by the trial court when it denied Schiff s motion for new trial on any of the alleged grounds. With regard to La. C.C.P. art. 1972(1), the trial court heard Ms. Pollard’s testimony on the matter, particularly when, during cross examination, she was repeatedly challenged about the origin of the deposit of $51,000. Again, the trial court made a credibility determination that we will not disturb on appeal.
121 As for newly discovered evidence, any motion for new trial under La. C.C.P. art. 1972(2) must be accompanied by an affidavit by Schiff as required by La. C.C.P. art. 1975; here it was not.[20] In *61 addition, the evidence is not newly discovered. As reflected in Mr. Sehiffs settlement offer dated 9 February 2010, he knew that his sister had loaned the business $50,000; this loan was used to buy the Filmore property. Mr. Sehiff repaid the loan with interest as acknowledged in the February 2010 offer. Since Sehiff knew about the loan, we find it dubious that he did not know that the check from his sister had been made payable directly to Ms. Pollard. While he argues that Liberty Bank did not provide a copy of the cancelled check until three days after the trial, Sehiff possessed these bank records and could have obtained this same information well before trial.
Finally, La. C.C.P. art. 1973 provides discretionary grounds to grant a new trial: “[a] new trial may be granted in any case if there is good ground therefor, except as otherwise provided by law.” The standard of review of a judgment on a motion for new trial, whether on peremptory or discretionary grounds, is that of abuse of discretion. See Magee v. Pittman, 98-1164, p. 19 (La.App. 1 Cir. 5/12/00), 761 So.2d 731, 746, writ denied, 00-1684 (La.9/22/00), 768 So.2d 602. The breadth of the trial court’s discretion to order a new trial varies with the facts and circumstances of each case. Horton v. Mayeaux, 05-1704, p. 11 (La.5/30/06), 931 So.2d 338, 344.
Whether to grant a new trial requires a discretionary balancing of many factors. Law v. State ex rel. Dep’t of Transp. & Dev., 03-1925, p. 7 (La.App. 1 Cir.11/17/04), 909 So.2d 1000, 1006, writs denied, 04-3154 and 04-3224 (La.4/29/05), 901 So.2d 1062. In deciding whether to grant a new trial, the trial court may evaluate the evidence without favoring either party; it may draw its own inferences and conclusions; and it may evaluate witness credibility to determine whether the jury erred in giving too much credence to an unreliable witness. Joseph v. Broussard Rice Mill, Inc., 00-0628, pp. 14-15 (La.10/30/00), 772 So.2d 94, 104.
A motion for new trial based solely on the ground of being contrary to the evidence is directed squarely at the accuracy of the judge’s factual determinations and must be viewed in that light.
Again, we find no such abuse of discretion. As it was the trial court that determined the facts of this case, we cannot say that the trial court erred in any way when it determined that its initial findings of fact were correct. This assignment of error is without merit.
We do note one error by the trial court that Sehiff raised in the motion for new trial but not on appeal. The trial court awarded Ms. Pollard the amount of $11,800 to reimburse her for the accounting prepared by Ms. Corcoran, but permitted interest on this amount from the date of judicial demand, rather than from date of judgment. In Cajun Electric Power Coop. v. Owens-Corning Fiberglass Corp., 616 So.2d 645, 646-47 (La.1993), the 'Court stated in pertinent part:
A court has authority to render a “judgment for costs.” La.Code Civ.P. art. 1920. Expert witness fees are taxed as costs and, once fixed, form a part of the final judgment. La. R.S. 13:3666. Clearly, under these provisions, an award of expert witness fees assessed as court costs against a judgment debtor is a money judgment in favor of the party who incurred the court costs. Bd. of Trustees v. All Taxpayers, 361 So.2d 292 (La.App. 1st Cir.1978). La.Code Civ.P. art. 1921 | ^provides that “[t]he court shall award interest in the judgment as prayed for or as provided by law.” Art. 1921 makes no distinction between the types of judgments that “shall” draw *62 interest. Moreover, there is no authority for this court to make a distinction between a judgment for expert witness fees taxed as court costs and other money judgments upon which interest accrues. Accordingly, we hold that legal interest may be awarded on a judgment for expert witness fees taxed as court costs.
[[Image here]]
Next, we must determine the date on which interest begins to accrue on an award of expert witness fees assessed as court costs. Owens contends that the court of appeal erred in awarding interest from the date of judicial demand. We agree. “When the object of the performance is a sum of money, damages for delay in performance are measured by the interest on that sum from the time it is due.... ” La. Civ.Code art.2000 (emphasis added). Thus, our inquiry is narrowed.
[[Image here]]
[Ujntil rendition of a judgment, no sum is due to either party upon which to award interest. Once expert witness fees are fixed under La. R.S. 13:3666, a certain and liquidated sum is due the judgment creditor from the judgment debtor. Accordingly, we hold that interest accrues on an award of expert witness fees taxed as court costs from the date of judgment fixing such fees. This holding is in line with this court’s prior decision of Hill v. Hill, 434 So.2d 1078 (La.1983), in which this court awarded legal interest on notary and appraiser fees assessed as court costs under La. R.S. 9:1423 from the date of final judgment when the debt became certain and liquidated.
In sum, we hold that interest on expert witness fees assessed as court costs is recoverable and that it accrues from the date the judgment was rendered fixing the amount of expert witness fees as court costs.
We find that we must amend the judgment accordingly.

Consolidated Writ Application Number 20U-C-0853

After the time to file a suspensive appeal had lapsed, Ms. Pollard took steps to collect on the outstanding judgment. On 8 October 2013, she filed a motion for a judgment debtor rule (La. C.C.P. art. 2451 et seq.). Schiff was directed to ^appear on 8 November 2013, with numerous documents as set forth in the trial court’s order setting the rule. Mr. Schiff appeared but did not produce the documents.
On 21 November 2013, Mr. Schiff filed for debtor relief (bankruptcy) in California. His devolutive appeal of the judgment at issue in the appeal before us was lodged in this court on 23 December 2013. He notified this court of the bankruptcy on 9 January 2014. An automatic stay went into effect because of the debtor relief filing.
The bankruptcy was dismissed on 28 May 2014, with the bankruptcy court allegedly finding that the bankruptcy was filed in bad faith; it was filed solely to avoid paying the judgment rendered in Ms. Pollard’s favor.
On 19 June 2014, Schiff was again ordered by the trial court to produce the documents ordered on 8 October 2013; the failure to do so was followed by a motion for contempt and an accounting filed by Ms. Pollard. The motion was heard on 16 July 2014.
In response to the motion, Schiff filed exceptions of improper service, failure to join a necessary or indispensable party, and failure to state a cause of action. At an expedited hearing on 21 July 2014, the trial court granted the exception of im *63 proper service, but denied the remainder of the exceptions. The hearing on the motion for contempt was reset for 2:00 p.m. on 22 July 2014.
Schiff filed a request for written reasons for the judgment announced by the court at the hearing on 21 July 2014. However, shortly before the hearing on 22 July 2014, Schiff filed a motion to recuse the trial court judge. The motion for recusal was referred to another judge for hearing, who denied the motion on 11 |¾August 2014. Schiff filed an application for supervisory writs with this court that was denied. Pollard v. Schiff, 14-1009, unpub. (La.App. 4 Cir. 11/24/14).
A written judgment from the 16 July hearing was rendered by the trial court on 31 July 2014. On 13 August 2014, Schiff filed a second application for supervisory writs seeking review of that second judgment that denied his exceptions of failure to join necessary/indispensable parties, failure to state a cause of action, and failure of the trial court to issue written reasons for judgment. We consolidated that writ application with this appeal.
We now address the writ before us, turning first to Schiff s complaint that the trial court did not issue written reasons for judgment.
It is a well-established rule that a trial court’s failure to provide written reasons for judgment is not grounds for reversing the judgment. Hall v. Folger Coffee Co., 03-1734, p. 4 n. 9 (La.4/14/04), 874 So.2d 90, 95. Further, the Louisiana Supreme Court, in a discussion of the applicable standard of review stated, “the trial court is not required to expressly analyze each factor in its oral or written reasons for judgment.” Gathen v. Gathen, 10-2312, p. 12 (La.5/10/11), 66 So.3d 1, 9.
Although courts are mandated to provide written reasons when requested, we find that the trial court adequately explained why it denied each exception during the hearing of 16 July 2014.
As for the remainder of the errors assigned by Schiff, we find no error and/or abuse of discretion by the trial court.
Accordingly, the writ application is properly denied.

12fíConclusion

Based on the foregoing, we enter judgment in favor of plaintiff/appellee, Ms. Pollard, and against defendants/appellants, Robert Andrew Schiff and N.O.W. Properties, LLC, in the total amount of $684,824.73, broken down as follows:
1. 50% of profits $373,312.80
2. Reimbursable expenses $188,015.93
3. Truck expenses $ 897.00
4. Property management $ 50,000.00
5. Utilities $ 5,000.00
6. Accounting $ 11,800.00
7. Personal funds $ 55,799.00
We award interest from date of judicial demand on the amount of $673,024.73 and interest from date of judgment on the award of $11,800 and any other costs awarded by the trial court.
The judgment, as amended, is affirmed.
Schiff s writ application 2014-C-0853 is denied.

AMENDED; AFFIRMED AS AMENDED;SUPERVISORY WRIT DENIED.

. Hereinafter, we refer to Robert Andrew Schiff and N.O.W. Properties, LLC collectively as “Schiff" and to Robert Andrew Schiff as "Mr. Schiff.” However, our references to "Schiff" as meaning collectively Mr. Schiff and N.O.W. Properties, LLC are actually a distinction without a meaningful difference herein.

. The only copy of the "napkin agreement” in the record indicates that it was sent by facsimile on 10 June 2007. However, the business arrangement began in March 2007; this is when the partnership purchased its first property.

. Ms. Parks testified at trial and was knowledgeable about the vast majority of the interactions between the parties. In fact, Ms. Parks did some work for the partnership for which she was compensated. Mr. Schiff testified that Ms. Parks was honest and would have no reason to lie.

.The only property that was purchased in N.O.W. Properties, LLC’s name was donated by the company to Mr. Schiff through an act of donation dated 28 December 2007.

. Despite Mr. Schiff s testimony, the typewritten agreement referred to the parties as ‘‘partners.” See infra at p. 52-53.

. In a settlement offer dated 9 February 2010, Mr. Schiff stated that Ms. Pollard would receive $82,500 from the proceeds of the Fil-more sale.

. An accounting was never performed by or on behalf of Schiff.

. La. C.C. art. 1997 provides that: "An obli-gor in bad faith is liable for all the damages, foreseeable or not, that are a direct consequence of his failure to perform.”

. In addition, the fact that Ms. Pollard attended closings and signed loan documents does not mean that she tacitly ratified the alleged agreement to place mortgages on the properties. She testified that she had no choice since Schiff funded the entire business.

.The trial court took exception to Mr. Anderson’s opinion that the Lakeview and West Lakeview neighborhoods were not directly comparable, thereby requiring location adjustments in the appraisals. As the trier of fact, the trial court was permitted to accept or reject the distinction made by Mr. Anderson. It is unknown why the trial court relied on the CMAs rather than the appraisals, other than those reasons expressed in the judgment.

. Both Mr. Schiff and Ms. Pollard were listed on this particular account; however, the bank statements were sent directly to Mr. Schiff in California.

. According to an exhibit entered into the record by Schiff, Mr. Schiff suffered a loss on the Filmore property of $1,379.

. For example, Mr. Schiff argues that Ms. Corcoran did not credit him for his expenses related to the mortgages in the amount of $172,784. The trial court concluded that he could not receive credit for these amounts because Ms. Pollard and he never contemplated mortgages being placed on the properties. In addition, the properties are all in Mr. Schiff's name; these debts are his. Therefore, this issue is mooted.

. Mr. Schiff entered into evidence lists he prepared himself detailing his investments into the partnership and presumed reimburs-ables to Ms. Pollard. These lists are not true accountings. In one of his exhibits, Schiff includes a bank statement from 2007 from Regions 2974 and a list of reimbursements from that account. Mr. Schiff claims that Ms. Pollard received a total of $87,215.99 from the account.

. Schiff attempted to exclude the same evidence less than two months before trial by way of a motion in limine. It was denied by the trial court.

. We find that the amount charged on credit cards that Ms. Pollard could not identify totaled $55,936.98, whereas the undocumented invoices and receipts totaled $98,684.99. Of the total amount of $154,621.97, only $351.79 is not identified as having been spent on any of the properties.

. The voice message from Ms. Pollard to Mr. Schiff was very complimentary and concilia *60 tory towards Mr. Schiff.

. The actual amount of the deposit was $51,500.

. La. C.C.P. art. 1975 provides that when the motion is based on article 1972(2), the allegations of fact therein shall be verified by the affidavit of the applicant.

.While La. C.C.P. art. 1972(2) is not identified in his motion for new trial, the memorandum attaches the bank official's affidavit as "Newly Discovered Evidence " in note 7.